## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. _____ |
| | : | |
| AIC, INC., | : | |
| COMMUNITY BANKERS SECURITIES, LLC, | : | |
| NICHOLAS D. SKALTSOUNIS, | : | |
| JOHN B. GUYETTE, and | : | |
| JOHN R. GRAVES, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| ALLIED BEACON PARTNERS, INC. (f/k/a | : | |
| Waterford Investor Services, Inc.), | : | |
| ADVENT SECURITIES, INC., and | : | |
| CBS ADVISORS, LLC, | : | |
| | : | |
| Relief Defendants. | : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1.    This matter involves an offering fraud and Ponzi scheme devised and orchestrated

by Defendant Nicholas D. Skaltsounis ("Skaltsounis"), founder and President of Defendant AIC,

Inc. ("AIC"), a privately-held holding company for three registered broker-dealers and a state-

registered investment adviser.  The scheme operated through the sale of millions of dollars of AIC

promissory notes and stock through misleading and false representations and disclosures that

masked the underlying financial hardship of AIC and its inability to pay promised returns without using new investor money.

2.     From at least January 2006 through November 2009 (the "relevant period"), AIC and Skaltsounis, directly and through registered representatives, including Defendant John B. Guyette ("Guyette") and Defendant John R. Graves ("Graves"), offered and sold more than $7.7 million in AIC common stock, preferred stock, and promissory notes (collectively, the "AIC Investments") to at least 74 investors in at least 14 states, including the State of Tennessee. Guyette and Graves were associated with Defendant Community Bankers Securities, LLC ("CB Securities"), one of the AIC-owned broker-dealers.

3.     AIC promised to pay interest and dividends ranging from 9 to 12.5 percent on the promissory notes and preferred stock, knowing that it did not have the ability to pay those returns. Indeed, during the relevant period, AIC and its subsidiaries were never profitable. AIC earned de minimus revenue, and its subsidiaries did not earn sufficient revenue to meet expenses. AIC's debt grew each year as a result of the money owed to investors, and the only significant source of money available to pay investor principal, interest, and dividends was money raised from the sale of new AIC Investments.

4.     Defendants never disclosed to investors the true nature of AIC's financial condition or provided adequate disclosure documentation with its offerings. In those instances in which written materials were provided (including a set of "Executive Summaries" created by Skaltsounis and AIC), the materials contained a myriad of material misrepresentations about AIC and its subsidiaries and their financial condition and otherwise omitted material information regarding these subjects.

5.      In offering and selling these investments, Skaltsounis, Guyette, Graves, and at least one other individual (a now deceased CB Securities registered representative who will be referred to as "Broker A") misrepresented and omitted material information relating to, inter alia, the safety or risk associated with the investments, the rates of return on the investments, and how AIC would use the proceeds of the investments. Throughout this Complaint, Guyette, Graves, and Broker A are referred to as the "CBS Brokers."

6.      In early December 2009, Defendants' scheme collapsed when they could no longer solicit investments or recruit new investors to pay back existing investors. As a result, the vast majority of AIC investors—many of who were elderly and unsophisticated investors who put their trust in Skaltsounis, Guyette, Graves, and Broker A—did not receive their promised returns and, in fact, lost their entire principal investments.

7.      As a result of the conduct described in this Complaint, Defendants Skaltsounis, Guyette, Graves, AIC, and CB Securities violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. In addition, Defendants AIC and CB Securities are liable as controlling persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]. Defendant Graves also violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

8.      As a result of the conduct described in this Complaint, Relief Defendants Allied Beacon Partners, Inc. (referred to herein as "Allied" or "Waterford," the latter being short for Waterford Investor Services, Inc., the name by which Allied Beacon Partners, Inc., was formerly known), Advent Securities, Inc. ("Advent"), and CBS Advisors, LLC ("CBS Advisors"), each of

3

which is or was a subsidiary of AIC, received ill-gotten gains to which they have no legitimate claim.

## JURISDICTION AND VENUE

9.       The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-9(e)] to enjoin such acts, transactions, practices, and courses of business, to obtain disgorgement and civil penalties, and for other appropriate relief.

10.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), and 80b-14].

11.      Venue lies in this judicial district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Transactions constituting the violations of the federal securities laws charged herein occurred within this judicial district. Among other things, a significant number of AIC investors are and were residents of this judicial district, Defendant Skaltsounis and Broker A met with investors and prospective investors in this judicial district, fraudulent written materials relating to the AIC Investments were sent to investors in this judicial district, oral misrepresentations were directed to investors in this judicial district, and Defendant CB Securities had an office in this judicial district (in Maryville, Tennessee) from which AIC Investments were fraudulently offered and sold.

12.     In connection with the conduct alleged in this Complaint, the Defendants, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in, or instrumentalities of, interstate commerce, or the mails, or the facilities of a national securities exchange.

## DEFENDANTS

13.     **AIC, Inc.,** is a Virginia corporation headquartered in Richmond, Virginia. During the relevant period, AIC was a holding company for three registered broker-dealers (Defendant CB Securities and Relief Defendants Allied and Advent) and a state-registered investment adviser (Relief Defendant CBS Advisors), which entities are discussed in more detail in paragraphs 14 and 18–20, below. Skaltsounis established AIC in 2000 and owns approximately thirty percent of AIC's common stock.

14.     **Community Bankers Securities, LLC,** is a limited liability company organized in the State of Colorado and headquartered in Richmond, Virginia. CB Securities was registered as a broker-dealer with the Commission from 1997 until December 23, 2009, when it filed a Broker-Dealer Withdrawal Form ("Form BDW") with the Financial Industry Regulatory Authority ("FINRA"). CB Securities primarily employed independent brokers who had office locations across the country, including in this judicial district. CB Securities supervised and employed the CBS Brokers. AIC owns approximately an eighty-eight percent interest in CB Securities. Before withdrawing its broker-dealer registration, CB Securities had approximately 7,000 customer accounts. In addition to providing broker-dealer services, CB Securities was approved by the Small Business Administration (the "SBA") as a pooler of SBA loans and other guaranteed loans.

15.     **Nicholas D. Skaltsounis**, age 66, resides in Richmond, Virginia. During the relevant period, he was the President and Chief Executive Officer of AIC and three of its

subsidiaries, CB Securities, Advent, and CBS Advisors. He was also a member of the board of directors of AIC and Chairman of the board of directors of Waterford Investor Services, Inc. (now known as Allied Beacon Partners, Inc.), a registered broker-dealer and AIC subsidiary. Skaltsounis holds Series 4, 5, 7, 12, 24, 27, and 63 securities licenses. Skaltsounis has been in the securities industry since 1976.

16. **John B. Guyette**, age 70, resides in Greeley, Colorado. During the relevant period, he was employed as a registered representative with CB Securities in its Greeley, Colorado, office. He holds Series 3, 7, 24, 27, and 63 securities licenses. Guyette has been in the securities industry since 1987. Before his association with CB Securities, Guyette was the founder and Chief Executive Officer of Elite Investments, LLC, a registered broker-dealer that was purchased by AIC in 2003 and renamed Community Bankers Securities, LLC.

17. **John R. Graves**, age 51, resides in Pensacola, Florida. From about August 2009 to December 2009, Graves was employed by AIC as the Vice President of Business Development and by CB Securities as a registered representative. He holds Series 4, 6, 7, 24, 26, 53, and 65 securities licenses. Also, from about January 2009 to about April 2010, Graves was the President of Compass Financial Advisors, LLC ("Compass"), an investment adviser registered with the Commission. In addition, Graves is a certified financial planner and the founder and President of Brooke Point Management, Inc. ("Brooke Point Management"), a private company that provides fixed insurance products, estate planning, and tax preparation services.

## RELIEF DEFENDANTS

18. **CBS Advisors, LLC**, is a limited liability company organized in the Commonwealth of Virginia, with its headquarters in Virginia. During the relevant period, it was an investment adviser registered with ten different States, including Tennessee. As of May 2010, CBS

Advisors reported having approximately $14 million in assets under management. In 2005, AIC acquired a ninety percent ownership interest in CBS Advisors.

19. **Allied Beacon Partners, Inc.**, is a Florida corporation headquartered in Clearwater, Florida. At all relevant times, Allied operated under the name Waterford Investor Services, Inc., or "Waterford." On or around February 7, 2011, Waterford was renamed Allied Beacon Partners, Inc. Waterford (and then Allied) has been registered as a broker-dealer with the Commission since 1999, and registered with the State of Tennessee to sell securities since 2006. It is also an investment adviser registered with the State of Florida. In 2005, AIC acquired a ninety percent ownership interest in Waterford.

20. **Advent Securities, Inc.**, is a Virginia corporation headquartered in Richmond, Virginia. Advent was registered as a broker-dealer with the Commission from 2004 until approximately January 2011 when it filed a Form BDW withdrawing its registration as a broker-dealer. In 2006, AIC acquired a ninety percent interest in Advent. Advent has never had any customer accounts or conducted any business. In 2006, Advent applied with the State of Tennessee for a registration to sell securities.

## OTHER RELEVANT INDIVIDUAL

21. **Broker A** was, during the relevant period, a member of AIC's board of directors, a registered representative at CB Securities, and an investment adviser associated with CBS Advisors. She held Series 6, 7, 24, 63, and 65 securities licenses. Broker A is deceased.

## FACTS

I. **AIC's Constant Need for Capital and the Defendants' Fraudulent Means of Raising That Capital from Investors**

22. At all relevant times, AIC and its subsidiaries (CB Securities, CBS Advisors, Advent, and Waterford) acted by and through Skaltsounis and AIC's board of directors and AIC's

and the subsidiaries' employees. CB Securities acted by and through Skaltsounis as well as its registered representatives. Defendants Skaltsounis, Guyette, and Graves and Broker A were employees of AIC and/or CB Securities and were acting in the course and scope of their respective employment when they committed the violations set forth in this Complaint.

23. AIC has never been profitable since it was formed in 2000. During the relevant period, AIC had almost no revenue from business operations, generating nominal revenue from the sale of insurance policies and through interest income. AIC's subsidiaries were also never profitable and did not earn sufficient revenue to meet expenses.

24. As a result, AIC and its subsidiaries were in constant need of capital to fund their operations.

25. AIC's need to raise capital was discussed at AIC board meetings that Skaltsounis and Broker A attended.

26. In order to raise capital, AIC and Skaltsounis issued and offered promissory notes and common and preferred stock to investors. As expenses continued to mount and obligations grew—including the obligation to pay interest and dividends and to return principal to investors— AIC and Skaltsounis met those obligations by seeking new investors and by selling (and offering to sell) more and more of the AIC Investments.

27. Skaltsounis directly sold—and used a select group of brokers from CB Securities, including the CBS Brokers—to sell the AIC Investments. Skaltsounis, through AIC and CB Securities, paid the CBS Brokers commissions in the form of cash and AIC common stock.

28. As described in more detail below, in offering and selling these investments, the Defendants made false and misleading disclosures and omitted material facts relating to the risks of

investing in AIC, AIC's financial performance (including the financial performance of its subsidiaries), and how AIC would use the investment proceeds.

29. AIC raised approximately $7,744,351 from at least 74 investors in at least 14 states, including Tennessee. At least thirty of these investors were retail brokerage customers of CB Securities. Many of the investors were unsophisticated and elderly.

30. The Defendants sold and offered to sell the AIC Investments even though they were unregistered securities, in violation of the registration requirements of the Securities Act. The Defendants' sales and offers to sell the AIC Investments were also in violation of the antifraud provisions of the federal securities laws. Among other things, Defendants AIC and Skaltsounis created and distributed to investors or prospective investors investment materials that contained numerous material misrepresentations regarding the financial condition of AIC and its subsidiaries, their past financial performance, and AIC's ability to repay investors. The Defendants also omitted material information relating to the AIC Investments in investment materials, while, at the same time, making oral misrepresentations to investors, including reassurances that their investments in AIC were "safe" and "secure." Defendants AIC, CB Securities, and Skaltsounis materially misrepresented the nature of CB Securities' SBA pooling business, leading investors to believe that it was a significant part of CB Securities' business from which it derived substantial revenues, when, in fact, CB Securities only derived nominal revenue from a single SBA pooling transaction.

31. At the times these misrepresentations and omissions were made, the Defendants knew that they were false and fraudulent, or were reckless in not knowing. The Defendants targeted elderly and unsophisticated investors, and, as a result of the Defendants' activities, dozens of investors have lost significant portions of their hard-earned savings, including retirement funds on which they were depending for their future financial security.

32.     Defendants' fraud operated in the nature of a Ponzi scheme whereby new investor money was used to pay back existing investors' principal, interest, and dividends. Specifically, during the relevant period, approximately $2,532,434 of new investor money was distributed back to investors. Skaltsounis also used investor money to pay himself $952,258 in salary, advances, loans, interest, and dividends during the relevant period. Approximately $3,629,282 was used, during the relevant period, to keep the subsidiary broker-dealers solvent and to allow them to meet "net capital" requirements.[1] During the relevant period, Skaltsounis directed AIC to make payments of $2,568,445 to CB Securities, $516,150 to Advent, $486,000 to Waterford, and $58,687 to CBS Advisors. These payments to Skaltsounis and the subsidiaries were made from the account holding investor money from the sales of AIC Investments secured by Defendants' fraud.

## II.     The AIC Investment Offerings

### A.     <u>Promissory Notes</u>

33.     From at least January 2006 through November 2009, AIC raised approximately $5,438,100 through the sale of at least 47 promissory notes ("notes") to both accredited and unaccredited investors. The notes set forth the investment amount and other terms, including, for instance, the interest rate and maturity date. The notes stated that the proceeds would be used for "business purposes only." The notes did not discuss any investment risks or the sources of payment of principal or interest. Nor did the notes disclose that the proceeds from the sale of the notes would be used to pay off prior AIC investors. Also, no financial reports or other similar written financial information was provided in connection with the sale of the notes.

---

[1]     Rule 15c3-1, issued pursuant to the Exchange Act, provides that broker-dealers are required to maintain sufficient "net capital" reserves in order to operate [17 C.F.R. § 240.15c3-1]. If a broker-dealer is not in net capital compliance, it can no longer accept and execute customer securities orders.

34.     The notes had interest rates ranging from 9% to 12.5% annually, and the maturity of the notes ranged from one month to three years. Some of the notes offered convertible features whereby the noteholder could convert the note into AIC common stock.

35.     Given that AIC only earned nominal business income during its nearly decade-long existence and given that AIC's subsidiaries were never profitable and never distributed funds back to their parent (AIC) for the purpose of repaying investors, the only way AIC could repay the notes (including accumulated interest) was through the recruitment of new investors and the sale of AIC Investments to them. Despite this knowledge of AIC's precarious financial straits—and its, at a minimum, Ponzi-like characteristics—AIC never distributed materials reflecting AIC's financial condition to noteholders or prospective noteholders, nor informed them that their investments (or, at least, a substantial part of their investments) would be used to pay obligations to other investors.

36.     AIC, CB Securities, Skaltsounis, Broker A, and Guyette also used another means to prop up AIC, so that it could continue its fraud without collapsing. AIC, through Skaltsounis, Broker A, and Guyette, convinced investors to extend the terms of—or "rollover," "renew," or "reinvest"—at least eighteen AIC notes. AIC and Skaltsounis sent noteholders letters presenting them with three choices: (a) reinvest the principal and interest at the prevailing rate; (b) receive interest earned and reinvest principal only; or (c) liquidate the note. AIC and Skaltsounis further represented in the letters that the proceeds and/or new note would be issued within ten days.

37.     The only written documentation that AIC provided in connection with this rollover decision was the one-page rollover letter itself. There were no financial reports provided, nor was there any other written information provided regarding AIC's worsening financial condition, AIC's inability to repay the interest or principal without new investments, or the risks associated with renewing a note.

11

38.     The only thing that AIC told noteholders in the rollover letters was that they could renew their notes (in whole or just with respect to principal), or they could liquidate their notes and receive their interest and principal in full. But AIC lacked the ability to repay the notes—even though investors were told that they could receive payment in full in ten days. This did not prove to be an immediate problem for AIC, because the majority of the noteholders renewed their notes. To induce a high rate of rollovers, Broker A and Guyette contacted noteholders and verbally assured them of the safety and security of their investments in AIC. This allowed AIC to the continue the fraud without immediately collapsing.

39.     Thus, the aforementioned actions relating to the rollovers represent both written and oral misrepresentations to investors: noteholders were told that they could receive payment within ten days (even though AIC lacked sufficient cash to make good on that offer), and investors were further lulled through these reassurances.

40.     Each of the rollover letters was signed by Defendant Skaltsounis.

41.     By November 2009, AIC had approximately $4 million in note obligations on its books as a result of issuing new notes and rolling over old notes.

**B.      Preferred and Common Stock**

42.     From at least January 2006 through November 2009, AIC also raised $430,000 through the sale of Series A preferred stock, $820,000 through the sale of Series B preferred stock, and approximately $1,056,251 through the sale of common stock.

43.     The preferred stock purported to pay annual dividends ranging from 10% to 12.5% and was convertible into common stock. The common stock did not pay a dividend.

44. The preferred stock was sold pursuant to subscription agreements. In addition, the preferred shareholders were required to complete a questionnaire attesting to their financial net worth.

45. The subscription agreements for the Series A and Series B preferred stock identified the terms of the purchase, purported to identify "risk factors," and contained an acknowledgement of receipt of company materials, including information purportedly contained on AIC's website. However, the risk factors set forth in the subscription agreements were general in nature, and none of the risk factors stated that the company earned only nominal revenue, that it had no ability to pay investors without new investor funds coming in, or that new investments would be used to pay other investors' interest, dividends, and principal. Also, the acknowledgement of receipt of materials was meaningless. Other than the subscription agreement itself, no AIC materials, including financial statements, were provided to preferred stockholders or prospective preferred stockholders.

46. There was no securities purchase agreement or other kind of agreement evidencing the purchase or sale of AIC common stock. Nor were there any other disclosure materials provided in connection with the purchase or sale of AIC common stock.

**III.     The AIC Investments Are Securities**

47. The AIC Investments sold to investors by the Defendants are securities within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], and the fraud and other misconduct described herein was in the offer of, and/or in connection with the purchase or sale of securities.

**IV.     The Sales and Offers to Sell the AIC Investments Were in Violation of the Registration Requirements of the Securities Act**

48. The Defendants sold or offered the AIC Investments, even though no registration statement was in effect as to AIC Investments and the AIC Investments were not exempt from the

registration requirements of the Securities Act. In connection with these sales or offers to sell, the Defendants made use of means or instruments of interstate transportation, or communication, or of the mails.

49.     Although AIC purported to have offered AIC Investments pursuant to Rule 506 of Regulation D under the Securities Act [17 C.F.R. § 230.506], these offerings are subject to integration under Rule 502(a) [17 C.F.R. § 230.502(a)]. During the relevant period, there was no period of six months or more in which there was no offer or sale of securities by AIC.

## V.     Skaltsounis and AIC Created and Distributed to Investors or Prospective Investors "Executive Summaries" That Contained Numerous Material Misrepresentations Relating to AIC and Its Subsidiaries

50.     Skaltsounis solicited AIC investments through the use of a March 2009 Executive Summary and a June 2009 Executive Summary (collectively, the "Executive Summaries"). The Executive Summaries contained material misrepresentations and omissions concerning, inter alia, AIC's business operations and its financial condition. For instance, the Executive Summaries depicted AIC and its subsidiaries as being on the verge of financial profitability and success, with the ability to capitalize on the economic downturn by acquiring distressed broker-dealers at all time lows. In reality, AIC's subsidiaries were themselves distressed broker-dealers that struggled to maintain net capital requirements each month. AIC omitted from the Executive Summaries that it had accumulated nearly $4 million in debt and that its expenses exceeded revenue each year.

51.     Further, there are several false statements in the Executive Summaries concerning the subsidiaries' ability to increase margins. AIC claimed that its subsidiaries increased margins in three ways: (1) through its SBA pooling business; (2) through its ability to generate investment banking fees; and (3) through its origination and offering of proprietary private placements. Each of these statements is false. As discussed above, the SBA pooling business was unsuccessful. AIC

14

and its subsidiaries generated less than $39,000 in investment banking fees, and they never offered or sold any proprietary products. Skaltsounis knew that each of these statements was false.

52. In addition, the Executive Summaries contained several other false and misleading statements, including that: (a) AIC had proven its ability to increase bottom line profits in companies it acquires; (b) AIC was able to partly offset the cost of acquisitions and quickly reach a break-even cash flow, often within six months of acquiring a broker-dealer; (c) AIC offered institutional investors a significant discount to prevailing prices for SBA pooled products in exchange for additional institutional business from banks; and (d) AIC had over $300 million in private proprietary placements to offer to investors. Skaltsounis knew that each of these statements was false and misleading.

## VI. The Failure to Provide Adequate Offering Materials in Connection with the Offer or Sale of the AIC Investments

53. Skaltsounis and the CBS Brokers orally solicited their customers and other investors through telephone calls or in person. They falsely misrepresented the financial condition of AIC and its subsidiaries and the safety and security of an investment in AIC. These oral misrepresentations were often made where inadequate disclosure materials (or no disclosure materials) were provided to investors or prospective investors.

54. Skaltsounis and the CBS Brokers did not provide prospective investors with appropriate materials describing AIC or its offerings or other material information about the risks associated with the investments and how the proceeds would be used. The only documentation provided were the notes themselves, an inadequate subscription agreement for the preferred stockholders, and the stock certificates themselves for the preferred and common stockholders.

55. Investors were not provided financial statements or offered access to financial information concerning AIC or its subsidiaries.

Case 3:11-cv-00176-TAV-HBG   Document 1   Filed 04/15/11   Page 15 of 32   PageID #: 15

## VII.    The Defendants' Material Misrepresentations and Omissions

56.    As noted above, each of the Defendants made material misrepresentations and omitted material information in offering and selling the AIC Investments.  Each knew, or was reckless in not knowing, about the lack of capital at AIC and its inability to meet its obligations to current investors while soliciting new investors with promises of high rates of return and safety of principal.

57.    The Defendants' misrepresentations and omissions alleged herein, individually and in the aggregate, are material.  A reasonable investor would consider the misrepresented facts and the omitted information important, or disclosure of the omitted facts or accurate information would have altered the "total mix" of information made available to investors.  In particular, the Defendants made misrepresentations and omissions concerning, inter alia, the financial health of AIC and its ability to meet its expenses and pay its obligations.  These issues are material.

58.    In connection with the conduct described below, the Defendants acted knowingly or recklessly.  Among other things, the Defendants knew or were reckless in not knowing that they were making material misrepresentations and omitting material information when they offered, sold, and/or solicited the purchase of AIC Investments.  Indeed, as members of AIC's board of directors, Skaltsounis and Broker A were aware of the precarious financial situation of AIC and its use of new investors' funds to pay existing investors.  The other CBS Brokers were, at a minimum, reckless in failing to undertake the actions necessary to allow them to inform investors about the risks associated with the AIC Investments and to determine whether AIC was an appropriate investment.  Despite this lack of knowledge, Guyette and Graves made statements to investors regarding AIC's then current financial health, its prospects, and its suitability as a safe investment.  The particular conduct of each pertinent individual is described below.

16

## A.  Defendant Nicholas D. Skaltsounis

59.    Defendant Skaltsounis directed and controlled AIC and its subsidiaries, and he had significant influence over the actions of AIC's board of directors.  Among other things, he often conducted and presided over meetings of AIC's board (after a short introduction by AIC's actual board Chairman), and his decisions regarding company business and how the AIC Investments would be marketed and sold (and the terms of those investments) were oftentimes simply ratified after-the-fact by AIC's board.

60.    Skaltsounis was involved with every aspect of the offerings of the AIC Investments, including establishing the nature and terms of the investments and signing investor checks, subscription agreements for the preferred stock, and promissory notes.

61.    Skaltsounis directly solicited and made representations to investors through telephone calls, investor meetings in this judicial district and elsewhere, and annual shareholder meetings, as well as indirectly, by causing certain registered representatives at CB Securities (including the CBS Brokers) to sell AIC Investments and through written misrepresentations.

62.    Skaltsounis knew the precarious financial condition of AIC and its subsidiaries, particularly AIC's need to raise capital for the purpose of paying back existing investors and to keep its subsidiaries solvent.  Skaltsounis knew that AIC did not have the ability to pay the principal and the promised returns on the notes.  Despite this knowledge, Skaltsounis omitted this and other material information from communications with investors and made affirmative misstatements to convince investors to purchase AIC Investments or to rollover their investments to delay payment of those obligations and to otherwise conceal the scheme from the investors.

63.    In oral and written communications with investors and prospective investors, Skaltsounis misrepresented the financial stability and sustainability of the company—even though

he knew throughout the relevant period that AIC was on the verge of financial collapse. Skaltsounis created the impression of financial stability by misrepresenting AIC's past and current financial performance and by depicting an extremely optimistic picture of AIC's future financial prospects that was unreasonable when made. Moreover, Skaltsounis never disclosed that AIC had accumulated millions of dollars in debt as a result of the various securities offerings, had never been profitable, and that its subsidiaries were never profitable and even struggled to meet net capital requirements. Moreover, he never disclosed that he was using new investor money to pay back principal and returns to existing investors—and to pay himself.

64.     In addition, AIC, through Skaltsounis, issued false and misleading rollover or reinvestment letters to investors. These letters created the misleading impression that AIC had the ability to pay the principal and interest on the notes upon maturity and had the ability to pay the promised future returns.

65.     For example, on April 29, 2009, three investors who invested a total of $91,000 were issued letters providing them with the opportunity to (a) rollover their original notes; (b) receive their accrued interest but otherwise rollover the notes; or (c) liquidate the notes. But these "options" were false promises. AIC had no ability to pay even the accrued interest and certainly had no cash available to liquidate the notes and to pay the investors their principal and interest. At the time AIC and Skaltsounis made these representations, AIC only had approximately $18,000 in its bank account and it owed approximately $3.5 million in note obligations. Through these rollover letters Skaltsounis falsely lulled investors into believing that their investments were safe, that AIC could pay back investors within the ten-day period set forth in the rollover letters, and that AIC could otherwise meet its obligations under the notes.

66.    In or around March 2009, when several AIC notes were scheduled to mature, Skaltsounis persuaded a broker at CB Securities to renew her own AIC notes and to reach out to her retail brokerage customers to see if they would renew their notes. During that conversation, Skaltsounis falsely stated to the broker that AIC's revenues had grown by twelve percent in 2008 and told the broker that AIC would be sold in three years, which purportedly would enable noteholders to be paid off in full and which would otherwise be a benefit to AIC investors. As a result of that conversation, the broker renewed her own notes, and she communicated that same information to her customers, all of whom renewed their notes.

67.    Skaltsounis also led investors to believe that CB Securities' status as an SBA pooler generated significant revenue for the firm. This was false. In reality, since January 2006, CB Securities sold only one SBA pooled loan which generated $11,797 in revenue for CB Securities. But Skaltsounis nonetheless told investors that, based on the company's performance, its future plans, and its status as an SBA pooler, AIC was financially secure and their investments were safe. Guyette and Graves, both of whom offered and sold AIC securities, relied on Skaltsounis' representations, which they then repeated to investors without reviewing any financial records or other documents to substantiate their employer's claims.

68.    AIC, through Skaltsounis, also misrepresented the rate of return on the notes and the preferred stock that the investors could expect to receive. AIC promised to pay 9% to 12.5% returns when the company had little or no ability to pay such returns. The promise of payment of those returns led investors to believe that the company had the ability to pay those returns and that those returns were being generated from the legitimate business activities of the company. Skaltsounis was responsible for establishing the rates of returns on the investments, and he intentionally offered those rates to attract investors.

69. Skaltsounis, directly and through AIC and the CBS Brokers, misrepresented how AIC used the proceeds of its investments. For example, he told investors and the CBS Brokers who were soliciting the AIC Investments that the proceeds would be used to grow and expand AIC's business. However, from at least January 2006 on, AIC never expanded its business in any meaningful way.

70. By way of further illustration, in or around August 2009, Skaltsounis told Graves, who at the time was a newly hired CB Securities broker, that any proceeds Graves raised from investors from the sale of AIC Investments would be used to purchase another broker-dealer. Graves told investors this when he sold them AIC preferred stock and promissory notes. However, AIC never used the money raised by Graves to purchase a broker-dealer.

71. Skaltsounis also signed the promissory notes issued to investors that falsely stated that proceeds from the notes would be used for "business purposes only." In reality, AIC used large portions of the proceeds of the sales of AIC Investments to pay back principal and returns to existing investors and to provide Skaltsounis with personal loans and advances, none of which was disclosed to investors.

**B.  Broker A**

72. During the relevant period, Broker A, like Skaltsounis, was a member of AIC's board of directors. She was also a registered representative at CB Securities and an investment adviser associated with CBS Advisors. She held Series 6, 7, 24, 63, and 65 securities licenses. Broker A is now deceased. Broker A's office, which was an office of CB Securities, was located in or around Maryville, Tennessee.

73.     As a member of the AIC board, Broker A knew or was reckless in not knowing that AIC was in poor financial condition and in constant need of cash not only to meet the expenses of its subsidiaries but also to pay existing investors.

74.     However, despite this knowledge, Broker A sold approximately $2.8 million in AIC promissory notes to her brokerage customers, almost all of whom were elderly and unsophisticated, and at least two of whom were unaccredited. The fact that investments were sold to unaccredited investors is significant because, even if AIC were offering investments pursuant to a valid exception to the Securities Act's registration requirements (which it was not), such sales could only be made to "accredited" investors, meaning, inter alia, investors with a certain level of net worth or annual income.

75.     Broker A earned a ten percent commission for the sale of the notes, which was paid in the form of AIC common stock.

76.     In selling the AIC Investments, Broker A knowingly misrepresented the safety of the investment and the financial condition of the company and failed to disclose to investors the material risks associated with the investments. Broker A told investors that their investments were safe and secure and that AIC was a profitable business. Broker A told investors that the AIC notes were similar to certificates of deposit ("CDs"), representing that the notes were safe like a CD but paid a higher rate of interest. These statements were false. Broker A also falsely led investors to believe that the notes would provide a steady stream of income for them in retirement.

**C.     Defendant John B. Guyette**

77.     Guyette was a registered representative in CB Securities' Greeley, Colorado, office, which operates under the trade name Elite Investments.

78.     From May 2006 to July 2006, Guyette offered, sold, and solicited the purchase of $207,000 in AIC Series A preferred stock and $100,000 in AIC notes. He solicited these investments from six investors, five of whom were his retail brokerage customers. In or around March 2009, he also convinced at least one investor to rollover or reinvest a $25,000 AIC note. He solicited these investments by telephone, in person, and in writing.

79.     Guyette was paid $21,490 in commissions by AIC, or 7% of the total investment amount, for his offer and sale of these AIC Investments.

80.     Guyette made material misrepresentations and omissions to investors concerning the safety of the investments, the financial condition of AIC, and the company's reasonable financial prospects when he offered, sold, and solicited these investments.

81.     Guyette also failed to disclose to investors the material risks associated with their AIC Investments. He never discussed the speculative nature of the investments or the likelihood of loss on the investments. Instead, Guyette misled investors by telling them that AIC Investments were safe and that AIC was well-financed and financially secure—all without any reasonable basis. Guyette also told investors that the interest and dividend rates on the notes and stock were achievable because they were only slightly higher than what banks were paying on CDs. This, too, was false.

82.     For example, in June 2006, Guyette wrote a false and misleading letter to a potential investor, a charitable foundation that was a brokerage customer of his, soliciting the purchase of AIC preferred stock. This letter contained numerous misstatements suggesting the safety of the investment and incorrectly guaranteeing future events about which Guyette had no firsthand knowledge. Shortly after Guyette sent this letter to the charitable foundation, it purchased $100,000 worth of AIC Series A preferred stock.

83.     Guyette knew that these representations were false or was reckless in making these oral and written misrepresentations and omissions, because he had no reasonable basis to make such statements or to solicit or recommend such investments. Despite his duties as the customers' broker, Guyette did not conduct a reasonable investigation of the AIC Investments or reasonable due diligence prior to offering, selling, or recommending the AIC Investments. He never knew AIC's financial condition, the purpose of its business operations, or how the proceeds from the sale of AIC Investments would be used.

84.     Guyette also made unsuitable investment recommendations when he offered and sold AIC preferred stock and promissory notes to his brokerage customers. The AIC Investments were risky and illiquid. He sold these investments to his retail brokerage customers with average to conservative risk tolerance and short-term investment objectives.

85.     For example, Guyette made an unsuitable recommendation to a charitable foundation (referenced in paragraph 82, above) that purchased $100,000 in AIC Series A preferred stock. Guyette knew or was reckless in not knowing that this investment was unsuitable given the charitable foundation's stated investment objectives and risk tolerance. The charitable foundation had indicated that it had a low risk tolerance and told Guyette that it wanted safe, conservative investments.

**D.      Defendant John R. Graves**

86.     In or around August 2009, Graves was hired by CB Securities as a registered representative and by AIC as Vice President of Business Development. At the time of his employment with CB Securities and AIC, he was also the President of Compass, an investment adviser registered with the Commission, through which he provided investment advice in exchange for management fees.

87.     During the relevant period, Graves had a fifty to seventy-five percent indirect ownership interest in Compass through his ownership of Financial Action Holding Group LLC ("FAHG"), the holding company of Compass. Graves acquired his ownership interest in FAHG by raising money through sales of common stock in his other business, Brooke Point Management.

88.     Graves first met Skaltsounis in or around June 2009. Graves was trying to sell Compass (along with another broker-dealer in which Graves had invested approximately $100,000) to AIC. Graves reached a verbal agreement with Skaltsounis that AIC would purchase Compass and the other broker-dealer if Graves could raise the money to fund the purchase.

89.     Skaltsounis promised that AIC would pay Graves a seven percent commission on the sale of any AIC securities. Skaltsounis also promised to pay Graves a salary of $85,000 per year.

90.     From about September 2009 to about October 2009, Graves offered, sold, and/or solicited the purchase of $715,000 in AIC Series B preferred stock and $110,000 in AIC notes. He solicited these investments from eight investors, five of whom were his retail brokerage customers, the other three being investment advisory clients of his at Compass. At least three of the eight investors were unaccredited. Graves solicited these investments in person and over the telephone. Graves approached some of his investors by either visiting them at their homes or taking them to lunch.

91.     In recommending and soliciting investments in AIC, Graves made material misrepresentations and omissions concerning the safety of the investments and the financial condition of the company. For example, Graves told investors that AIC was a safe investment that could provide a steady stream of supplemental income. He also reassured investors that AIC had the ability to pay the promised returns because it was a reliable company.

92.     Graves failed to disclose to investors that AIC did not have sufficient capital to pay the promised returns on the preferred stock and the notes.   He also failed to disclose the investment risks associated with purchasing the AIC preferred stock and notes.

93.     Several of the investors did not understand the nature of the investment but trusted Graves' judgment to invest their money in safe and reliable companies.  For example, one unaccredited investor, who at the time of the investment was unemployed and had very little savings, invested $30,000 in AIC because Graves told her that her money would be safe and that she could get back more money at maturity than she invested.  This investment represented a significant portion of the investor's savings, and she would not have invested the money had she known there was even a small risk of losing the investment.

94.     Graves also failed to disclose to brokerage customers and investment advisory clients that he had a personal financial interest in AIC.  Skaltsounis had represented that the investor funds he raised would be used by AIC to purchase a broker-dealer and investment adviser in which he had a personal and financial stake.

95.     Graves knew or was reckless in not knowing that he made material misrepresentations and omissions when he offered, sold, recommended, and/or solicited the purchase of AIC Investments.  Although Graves himself believed that there was significant risk involved with the investment and that AIC was a speculative investment, he did not disclose these facts to investors.

96.     Despite his duties to investors, Graves also did not conduct any reasonable due diligence on the AIC Investments.  He relied only upon conversations he had with Skaltsounis and his physical observation of AIC's office location.  Prior to offering, selling, recommending, and/or soliciting the AIC Investments, Graves:

a.    did not know the financial condition of AIC;

b.    asked Skaltsounis for the financial statements for AIC and its subsidiaries, a request refused by Skaltsounis;

c.    believed that the AIC investment was unusual because he had never sold any investments with the rates of return offered by AIC; and

d.    never sold a private placement without an offering document such as a private placement memorandum.

**FIRST CLAIM FOR RELIEF**
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(Against All Defendants)**

97.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 96, above, as if the same were fully set forth herein.

98.    As a result of the conduct alleged herein, Defendants AIC, CB Securities, Skaltsounis, Guyette, and Graves, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

99.    No valid registration statement has been filed with the Commission or has been in effect with respect to any offering or sale alleged herein.

100.    By engaging in the foregoing conduct, Defendants AIC, CB Securities, Skaltsounis, Guyette, and Graves violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (Against All Defendants)

101.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 100, above, as if the same were fully set forth herein.

102.    From at least 2006 through November 2009, as a result of the conduct alleged herein, Defendants AIC, CB Securities, Skaltsounis, Guyette, and Graves knowingly or recklessly, in the offer or sale of securities, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

    a.    employed devices, schemes or artifices to defraud;

    b.    obtained money or property by means of, or made, untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.    engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon offerees, purchasers, and prospective purchasers of securities.

103.    By engaging in the foregoing conduct, Defendants AIC, CB Securities, Skaltsounis, Guyette, and Graves violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF
## Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against All Defendants)

104.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 103, above, as if the same were fully set forth herein.

105.     From at least 2006 through November 2009, as a result of the conduct alleged herein, Defendants AIC, CB Securities, Skaltsounis, Guyette, and Graves, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentality of interstate commerce or of the mails, or a facility of a national securities exchange:

     a.     employed devices, schemes or artifices to defraud;

     b.     made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

     c.     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

106.     By engaging in the foregoing conduct, Defendants AIC, CB Securities, Skaltsounis, Guyette, and Graves violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## FOURTH CLAIM FOR RELIEF
## Violations of Sections 206(1) and 206(2) of the Advisers Act
### (Against Defendant Graves)

107.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 106, above, as if the same were fully set forth herein.

108. As a result of the conduct alleged herein, Defendant Graves, directly or indirectly, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, while acting as an investment adviser:

        a.      with scienter, employed devices, schemes, or artifices to defraud advisory clients or prospective advisory clients; and

        b.      engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon clients or prospective clients.

109. By engaging in the foregoing conduct, Defendant Graves violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## FIFTH CLAIM FOR RELIEF
### Controlling Person Liability Under Section 20(a) of the Exchange Act
### (Against Defendants AIC and CB Securities)

110. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 109, above, as if the same were fully set forth herein.

111. In addition to their liability under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, AIC and CB Securities also are liable as controlling persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

112. Defendant AIC is, or was at the time acts and conduct set forth herein were committed, directly or indirectly, a person who controlled Skaltsounis and Broker A. As detailed above, Skaltsounis and Broker A sold AIC securities in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

113. Defendant CB Securities is, or was at the time acts and conduct set forth herein were committed, directly or indirectly, a person who controlled Skaltsounis and the CBS Brokers. As

detailed above, Skaltsounis and the CBS Brokers sold AIC securities in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

114. By reason of the foregoing conduct, AIC and CB Securities are joint and severally liable with, and to the same extent as, the persons they controlled for violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## SIXTH CLAIM FOR RELIEF
### Claims with Respect to Relief Defendants
### (Against Relief Defendants)

115. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 114, above, as if the same were fully set forth herein.

116. Relief Defendants Allied, Advent, and CBS Advisors each received proceeds of the fraud described herein, over which they each have no legitimate claim.

117. By reason of the foregoing conduct, Relief Defendants Allied, Advent, and CBS Advisors have been unjustly enriched and must be compelled to disgorge the amount of their unjust enrichment.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a final

judgment:

### **I.**

Permanently restraining and enjoining Defendants AIC, CB Securities, Skaltsounis, and

Guyette from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a),

77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

[17 C.F.R. § 240.10b-5] thereunder;

### **II.**

Permanently restraining and enjoining Defendant Graves from violating Sections 5(a),

5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of

the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.§ 240.10b-5] thereunder, and

Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### **III.**

Ordering Defendants AIC, CB Securities, Skaltsounis, and Guyette and Relief

Defendants Allied, Advent, and CBS Advisors to disgorge any and all ill-gotten gains, together

with prejudgment interest, derived from the activities set forth in this Complaint.

## IV.

Ordering Defendants AIC, CB Securities, Skaltsounis, Guyette, and Graves to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## V.

Ordering Defendant Graves to pay civil penalties pursuant to Section 217 of the Advisers Act [15 U.S.C. § 80b-17];

## VI.

Retaining jurisdiction of this action for purposes of enforcing any final judgments and orders; and

## VII.

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

Dated: April 15, 2011.

s/ Michael J. Rinaldi
Daniel M. Hawke
Elaine C. Greenberg
G. Jeffrey Boujoukos
Mary P. Hansen
Scott A. Thompson
Michael J. Rinaldi
Jennifer L. Crawford

Attorneys for Plaintiff:

**SECURITIES AND EXCHANGE COMMISSION**
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, Pa. 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
RinaldiM@sec.gov