# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE, TENNESSEE

Securities & Exchange Commission,  :
                                   :
                    Plaintiff,     :
                                   :
vs.                                :          Case No. 3:11-cv-176
                                   :
AIC, Inc., et al.                  :          **Motion to Compel**
                                   :
                    Defendants.    :

Transcript of proceedings before the Honorable H. Bruce Guyton,

U. S. Magistrate Judge, on February 21st, 2013.

Appearances:
                         On behalf of the Plaintiff:

                         Michael J. Rinaldi, Esq.
                         Philadelphia, Pennsylvania


                         On behalf of the Defendants:

          Heather G. Anderson, Esq.        Steven S. Biss, Esq.
          Knoxville, Tennessee             Charlottesville, VA


Court Reporter:
                         Donnetta Kocuba, RMR
                         800 Market Street, Suite 132
                         Knoxville, Tennessee 37902
                         (865) 524-4590

I N D E X

Oral Argument on Plaintiff's Motion to

   Compel Discovery:


          By Mr. Rinaldi -        3, 40


          By Mr. Biss -        32, 43

1      (Whereupon, Thursday, February 21st, 2013, Court convened

2  in the following matter at 9:35 a.m.)

3              COURTROOM DEPUTY:  Case Number 3:11-cr-176,

4  Securities Exchange Commission versus AIC, Inc., et al.  Here on

5  behalf of the Plaintiff is Michael Rinaldi. Is counsel for the

6  Plaintiff present and ready to proceed?

7              MR. RINALDI:  Yes, your Honor.

8              COURTROOM DEPUTY:  Here on behalf of the

9  Defendant is Steven Biss and Heather Anderson. Is counsel for the

10  Defendants present and ready to proceed?

11              MR. BISS:  We are.

12              THE COURT:  Good morning, counsel. The case is

13  before the Court this morning to take up this motion to compel

14  discovery filed by the Plaintiff, which is court-filed Document 76.

15  Mr. Rinaldi, I know your reply was filed about a month ago. Why

16  don't we start with you?

17      First of all, let me know if there's been any change in the

18  status of anything since you filed your reply, especially with

19  regard to scheduling depositions and so forth.

20              MR. RINALDI:  Yes, your Honor.

21              THE COURT:  If you would, come to the podium so the

22  court reporter can hear you.

23              MR. RINALDI:  Thank you, your Honor.  The last

24  thing the Government wanted to do was to file this motion to

25  compel and to have your Honor be burdened by it.  The commission

1   staff has made every effort to try to resolve this dispute short of

2   filing this motion to compel discovery.

3       Part of the problem here is that the AIC Defendants have

4   asserted wide-changing affirmative defenses, but have resisted

5   providing the Commission with reasonable discovery about these

6   defenses. One example of this is the AIC Defendants' "advice of

7   counsel" defense.

8       At his deposition, Defendant Skaltsounis, who is one of the

9   AIC Defendants, was not able to offer any specifics about the

10  advice sought or received from AIC's former lawyer, but he did

11  testify, again, without any specifics, that advice was sought from

12  the lawyer at meetings of AIC's board of directors.

13      In such circumstances, how can Defendant Skaltsounis testify

14  about what may or may not have transpired at the board meetings

15  without producing copies of audiotapes of those meetings? There's

16  no dispute–

17          THE COURT:  Did you ask him that?

18          MR. RINALDI:   I'm sorry?

19          THE COURT:  Did you ask him if he had any

20  recollection of what occurred at the board meetings?

21          MR. RINALDI:   Yes, I did, your Honor.

22          THE COURT:  And what did he say?

23          MR. RINALDI:   He was not able to provide any

24  specifics about the advice that he supposedly sought from AIC's

25  former counsel.

1      THE COURT:   Nonetheless, you expect him to testify

2   with specificity as to what happened at the board meetings?

3      MR. RINALDI:   Well, if he's going to maintain an

4   "advice of counsel" defense, your Honor, he needs to set forth what

5   he disclosed to his attorney, what the advice sought was, and what

6   the advice received from counsel was, and that he relied on that

7   advice in good faith.

8      THE COURT:   He's already testified, you said, that he

9   doesn't know of any such information.

10      MR. RINALDI:   That's right. But, nonetheless, the AIC

11   Defendants are still maintaining the "advice of counsel" defense.

12      THE COURT:   Well, maintaining it and prevailing are

13   two different things, aren't they?

14      MR. RINALDI:   Yes, your Honor.

15      THE COURT:   Just wondering, are you trying to create

16   the defense for them and the position, where they haven't been able

17   to, or is this a legitimate discovery request?

18      MR. RINALDI:   Not at all, your Honor. Because the

19   tapes are not only relevant to the AIC Defendants' "advice of

20   counsel" defense; they are relevant to the Government's case-in-

21   chief. What this case is about is fraudulent misrepresentations that

22   were made to investors of AIC.

23      We have testimony, for instance, from one board member that

24   AIC's board of directors discussed sending what are called rollover

25   letters to AIC's investors, to induce them to roll over their

1    investments, precisely because AIC did not have the funds

2    necessary to pay back those investors even though they were

3    telling the investors that they did have the funds to pay back the

4    investors.

5          What transpired at the board meetings is not only relevant to

6    the "advice of counsel" defense that the AIC Defendants are trying

7    to maintain, but it's also relevant to what Mr. Skaltsounis knew,

8    his scienter, and what was being discussed at these board meetings

9    about what representations would be made to investors.

10          We don't know the answer to that question, but we do know

11   that there's no dispute that audio recordings were made. Not only

12   third-party witnesses have testified to that; Mr. Skaltsounis

13   himself has testified to it. No one has testified that the audio

14   recordings were disposed of in the regular course of AIC's

15   business. To the contrary, Ms. Tabar, who was Mr. Skaltsounis'

16   former executive assistant, testified that the tapes were maintained

17   with the minutes in AIC's files.

18          Put simply, there's no reason why these audio recordings

19   should not have been produced. Now, we think that the AIC

20   Defendants should go back into their files, try to locate the audio

21   recordings and produce them to the Government.

22          What's particularly telling here is what transpired.  AIC was

23   investigated by the Securities & Exchange Commission in 2009,

24   and thereafter. Investigative subpoenas were served on the AIC

25   Defendants which called for, among other things, these particular

1    audio recordings. They weren't produced at the time.

2         Then the Government served its document request in this

3    action. The audio recordings still were not produced and they

4    weren't even mentioned to the Government. We had to learn about

5    them from Ms. Tabar at a third-party deposition about nine months

6    after our discovery requests were served.

7         Even then the AIC Defendants refused to respond to any

8    requests about the audio recordings, refused to respond to

9    correspondence that I sent to AIC Defendants' counsel in the

10   month following Ms. Tabar's deposition.

11        And when AIC's lawyer finally spoke about the matter, he

12   represented to your Honor that the tapes didn't exist. Now, in

13   response to the instant motion, defense counsel takes the position

14   that the tapes may or may not have been kept by AIC, but, of

15   course, that contradicts the only sworn testimony on the subject.

16        And the tapes are only one problem with the document

17   production by the AIC Defendants. We also learned at Ms. Tabar's

18   deposition that she kept a file of investor communications in the

19   course of her duties as Defendant Skaltsounis' executive assistant.

20        When asked about this file, defense counsel denied it even

21   existed. But in his Christmas Eve e-mail to the Plaintiff's counsel,

22   myself, he took a different tack, saying that there may be

23   documents evidencing communications with investors that were

24   not provided to the counsel for the Commission, but which would

25   be in one of the over 200 boxes of documents at the Richmond

1   apartment building.

2        Put simply, in a case that involves what communications were

3   made to investors and whether those communications were

4   fraudulent, if there are communications with investors in 200

5   boxes of documents, or thereabouts, in a Richmond apartment

6   building which have not been produced according to Rule 34, have

7   not been produced as they were kept in the usual course of

8   business, or with any organization, for that matter, then the AIC

9   Defendants have to produce those documents or there should be

10  severe sanctions imposed on the AIC Defendants.

11       And let me just say, your Honor, the Commission staff has

12  tried to meet that AIC Defendants more than halfway on the

13  subject. Myself and the paralegal from our office spent two days in

14  that Richmond apartment building, in a dingy basement, where

15  documents were strewn about, with no particular organization, in

16  boxes that were overflowing and busting at the seams.

17       There were other documents that were literally in an

18  unsecured property management office; in other words, the room in

19  the building where, among other things, tenants come to lodge

20  complaints about the apartment building; piled up in stacks,

21  shoved under a low overhead.

22       There was no practicable way for the Commission staff to

23  review those documents. We did the best that we possibly could,

24  but the fact is that some of the documents are not in any way

25  reviewable by us that is in any sense practicable, and the

1  documents were not produced in accordance with Rule 34. They

2  were not produced as they were kept in the usual course of

3  business.

4      And, by the way, the AIC Defendants didn't even contend that

5  that was the case, and they certainly haven't met their burden under

6  the law to proof that that was the case. And it's undisputed that the

7  documents were not organized and labeled according to the

8  categories set forth in the responses.

9      Basically, what Mr. Biss and his clients want the Commission

10  to do is to go on a chase through boxes of documents that they put

11  in this apartment building in no particular order. And this is not a

12  circumstance, your Honor, where the Commission comes along

13  many years after the fact and says, you know, we want the AIC

14  Defendants to perform some unreasonable task.

15      When the AIC Defendants did what they did with their

16  documents, they were on notice of the Commission's investigation,

17  they were in receipt of the Commission's investigative subpoenas,

18  and they were aware that this litigation was likely to be filed.

19      And in point of fact, some of the documents that we're talking

20  about are only relevant because of the AIC Defendants' affirmative

21  defenses. But notwithstanding what they were aware of at the time,

22  they decided to take boxes of documents from various corporate

23  entities, put them all together in a situation where they don't have

24  any rational organization.

25      Mr. Biss' client testified at deposition that he has no idea

1   where the audio recordings of AIC's board meetings would be

2   because the documents don't have any particular organization, and

3   that simply doesn't comply with Rule 34.

4        Mr. Biss and his clients need to go through those documents,

5   find the documents that are responsive to the Commission's

6   document requests, and produce the responsive documents to the

7   Commission.

8        And it's not just the investor communications, Ms. Tabar's

9   files and the audio tapes; the documents at the Richmond apartment

10  building are corporate and brokerage documents for, among other

11  things, Defendant AIC and Defendant Community Bankers

12  Securities.

13       You know, those documents will undoubtedly contain

14  responsive documents and relevant documents to this action, and

15  there's no excuse whatsoever for not producing them.  And the

16  Commission should not be prejudiced by the conduct of the AIC

17  Defendants.

18       We can expect Mr. Skaltsounis to get on the stand and testify

19  about communications that he had with investors. That's what this

20  case is about, the fraudulent misrepresentations to AIC's investors.

21  And we ought to have the benefit of documents evidencing those

22  communications.

23       Mr. Biss, in his December 24th e-mail, and in other documents

24  that he's provided to the Commission staff, has conceded that those

25  types of documents are in the Richmond apartment building.

1    There's no excuse for not having produced them.

2          As to the issue regarding depositions, here's what I would

3    say, your Honor.  We came before your Honor for a telephone

4    conference on the Plaintiff's request for a discovery conference

5    regarding certain issues, including the scheduling of depositions.

6          You asked the parties to confer.  Despite your request that the

7    parties confer, we were not able to confer with the AIC

8    Defendants' counsel because they refused to confer with the

9    Plaintiff's counsel. He promised to provide deposition dates by

10   December 9th; he failed to do so. He then promised to provide

11   deposition dates by January 3rd; he failed to do so.

12         And, by the way, your Honor, asking Mr. Biss to provide

13   dates that he would be available for depositions is not some kind of

14   great task. There's no reason that this had to take months to get

15   done. There's no other explanation for it than that he's playing

16   games.

17         Finally, on January 4th, we had to file the instant motion, he

18   still delays, until two days before his opposition brief, to provide

19   the Commission counsel with available dates. That was January

20   16th.  Then, on January 24th, he starts taking dates off the table. On

21   January 25th he takes more dates off the table in an e-mail time-

22   stamped 4:50 p.m.  I respond with an e-mail on January 28th the

23   following morning, at 10:14 a.m., trying to set deposition dates

24   with Mr. Biss, and I'm informed that two of the dates that I

25   suggested are no longer available.

1        Frankly, your Honor, you know, we're trying to deal with our

2   own schedules as well. In certain cases we're trying to deal with

3   third parties and their counsel.

4            THE COURT:   Have you and Mr. Biss, since January–

5   let's see, let's see. I was provided with an e-mail from Mr. Biss to

6   you, dated December 24, which says in part, "I will update

7   available deposition dates when I return from Canada on January

8   the 3rd."

9            MR. RINALDI:    That never happened, your Honor.

10           THE COURT:   And since January 3rd until today have

11  you and Mr. Biss had a phone conversation where you–

12           MR. RINALDI:   We have had no–

13           THE COURT:   –discussed dates?

14           MR. RINALDI:    We have had no telephone

15  conversations. He has from time to time provided us with dates

16  when he is available for depositions, and we have attempted to

17  schedule depositions for the dates that he said.  Virtually every

18  date that he's provided us, I've made myself available for

19  depositions. We took two depositions earlier this month; we have

20  others scheduled for March.

21       Frankly, your Honor, there's no reason we couldn't complete

22  the depositions in this action using the dates in March and April.

23  He's now contending he's unavailable for anymore dates in the

24  month of March. He claims he's available for March 22nd, but that's

25  the date we've already told him that we would take the deposition

1   of Community Bankers Securities, which is one of the Defendants

2   in this action.

3        I don't know if your Honor is going to force Mr. Biss to make

4   himself available for additional dates in March, but what he would

5   ask for is the dates that he provided us. He sent me an e-mail just as

6   I was heading to the airport yesterday, with a new, updated list of

7   dates that he's supposedly available for depositions.  What I think

8   it really should be is–

9            THE COURT:   What are those dates?

10           MR. RINALDI:    There were no dates in the month of

11  March other than March 22nd, which is the date that we've already

12  informed him that we were–

13           THE COURT:   So you have a deposition already set on

14  March 22nd?

15           MR. RINALDI:    March 22nd.

16           THE COURT:   When is the next date after that?

17           MR. RINALDI:    April 12th.

18           THE COURT:   Are you available on April 12th?

19           MR. RINALDI:    I can make myself available on April

20  12th, your Honor.

21           THE COURT:   Who are you going to depose on April

22  12th?

23           MR. RINALDI:    Well, we're trying to set up

24  depositions with a number of third parties, so I don't know,

25  because I have to contact their counsel.

1          THE COURT:   April 12th, then you all are going to take

2    depositions on April 12th. What's the next date?

3          MR. RINALDI:   April 15th.

4          THE COURT:   Okay. Are you available that date?

5          MR. RINALDI: I can be available that date, your Honor.

6          THE COURT:   So you all are going to take depositions

7    on April 15th. What's the next date?

8          MR. RINALDI:   April 16th.

9          THE COURT:   Are you available that day?

10         MR. RINALDI:   I can make myself available that day,

11   your Honor.

12         THE COURT:   Okay. Mr. Rinaldi (sic), have I not said

13   a date yet that you've become unavailable since yesterday?

14         MR. BISS:   No, sir.

15         THE COURT:   All right. April 16th. We've got three

16   days now set in April. What's next?

17         MR. RINALDI:   The 17th, 18th and 19th.

18         THE COURT:   How do you look for those dates, Mr.

19   Rinaldi?

20         MR. RINALDI:   I can make myself available on any of

21   those days, your Honor.

22         THE COURT:   All right. The parties will set aside

23   those three days. Will that be enough to get the depositions

24   completed in this case?

25         MR. RINALDI:   The one other issue is, we have a

1  30(b)(6) set of AIC, Incorporated, which is the principal defendant

2  in this action.

3          THE COURT:   What date is that set for?

4          MR. RINALDI:   I believe that is set for April 10th, your

5  Honor.

6          THE COURT:   Okay. I'll put that on there, April 10th.

7          MR. RINALDI:   Your Honor, let me just check my files

8  here, and I'll confirm that.

9          THE COURT:   All right.

10          MR. RINALDI:   I'm sorry. AIC is set for March 21st.

11  Mr. Skaltsounis is set for April 10th.

12          THE COURT:   Do you agree with that, Mr. Biss?

13  Started to call you Mr. Bliss. Mr. Biss?

14          MR. BISS:   I do, sir, yes.

15          THE COURT:   All right. April 10th is set. Good. And

16  March 21 is set, right?

17          MR. RINALDI:   Right. We have March 21. The

18  depositions that we have scheduled coming up are: on March 1st, we

19  have Roger Leibowitz, who Mr. Biss has agreed to produce. On

20  March 4th we have Mr. Palena (phonetic), who is being deposed in

21  New York City, who is an employee of one of the Relief

22  Defendants.

23      On March 21st we have AIC's 30(b)(6) deposition, on April

24  10th we have Mr. Skaltsounis' deposition, and we've now set aside

25  at least the 12th, 15th, 16th, 17th, 18th and 19th for depositions in this

1    action.

2              THE COURT:   All right.  Can you depose Mr.

3    Skaltsounis in one day?

4              MR. RINALDI:   Well, your Honor, we've already taken

5    him for one day, your Honor, earlier–

6              THE COURT:   I understand that. Can you take him in

7    one day now?

8              MR. RINALDI:   Your Honor, it's going to depend on

9    what Mr. Skaltsounis says.  At his earlier deposition he, at times,

10   went on long rants about how the SEC was acting like the Gestapo,

11   for instance.

12             THE COURT:   I just need a yes or no.

13             MR. RINALDI:   I don't know. We may be back, your

14   Honor, for an additional day with Mr. Skaltsounis.

15             THE COURT:   Okay.  Well, you have other dates

16   you've now set aside, so you can use those dates if you have to.

17             MR. RINALDI:   And also, your Honor, we have one

18   date set up with AIC, which is the principal defendant here.  We

19   asked Mr. Biss for a second date with AIC, given the number of

20   affirmative defenses, the number of investors involved here, et

21   cetera.

22        We don't know that we'll need that additional date, but we

23   would be available to do that in one of those dates in April, if

24   necessary. And there may be additional depositions that we need

25   after the 19th based on what transpires at these various depositions.

1          Again, we have third parties that we're dealing with, but we

2    will make every attempt to get done the depositions that we need.

3    He's also set forth the 22nd, the 23rd, the 24th, 25th, 26th, 29th and 30th

4    of April.  We can make ourselves available on those dates as well.

5    Again, a lot of this is going to have to do with third parties and

6    their availability, but we'll make every effort to get these

7    depositions done.

8          The only issue that we have is, the Plaintiff has its expert

9    disclosures that are due on April 26th. To the extent that we may

10   need some additional time to finalize that report based on these late

11   depositions, we would expect that the defense counsel wouldn't

12   have any objection to a slight extension of that date without

13   moving the trial date or anything of that sort.

14          MR. BISS:    Your Honor, I confirm I would have no

15   objection to reasonable extensions.

16          THE COURT:   Whatever extensions you do will be

17   reciprocal.

18          MR. RINALDI:   Okay.  As to the–

19          THE COURT:   What about Mr.– has Mr. Biss asked you

20   for any depositions that need to be scheduled?

21          MR. RINALDI:    The only one that he's mentioned that

22   he's wanted to take was of Troutman Sanders, LLP, which is the

23   law firm that formerly represented AIC.

24          THE COURT:   All right.  Do you have a date for that?

25          MR. RINALDI:   I don't know, because I– I'm not

1    seeking that deposition.

2           THE COURT:  That's fine.  I'll ask counsel when he

3    steps up.

4           MR. RINALDI:    As to the document request responses,

5    your Honor, we're continuing to have a problem. I don't want to go

6    through each one of them because I don't know that that's the best

7    use of your Honor's time.

8           But what I will say is this. We have a continuing pattern of

9    where we ask for responsive documents; we may or may not get an

10   objection. Most of them, we don't get objections to. But then we

11   get a statement to the extent that, you know, we'll produce these

12   documents, and there will be some enumeration, as opposed to we

13   will produce all responsive documents to the requests.

14          We think that Mr. Biss and his clients ought to produce all

15   responsive documents to the requests, unless they have an

16   objection, and that most of the document requests that we've set

17   forth, they have set forth no specific objections to.

18          The other problem with the document request responses

19   comes at the very end of the responses, and these, your Honor,

20   were served after the filing of our reply brief. These are document

21   request responses, to be clear, your Honor, that relate to document

22   requests that were served on January 6th, 2012. We did not get these

23   supplemental responses until January, 2013, over 12 months after

24   we served the requests.

25          At the very end of the document request responses, Mr. Biss

1   sets forth, basically, a disclaimer, saying, you know what, we don't

2   really know what you're talking about with respect to certain of the

3   document requests because you, Plaintiff, haven't identified who

4   AIC's investors were.

5           Now, there are several problems with this, your Honor.  First

6   of all, it goes squarely against the ruling that you made on the AIC

7   Defendants' Rule 12(e) motion over a year ago. Second, the

8   Plaintiff has, in fact, served initial disclosures in this action where

9   all sorts of names are provided to the AIC Defendants.

10          Third, the AIC Defendants know full well who their investors

11  were. Among other things, they responded to an interrogatory

12  request that asked for that information by using Rule 33(d) and

13  referring the Plaintiffs to particular documents.

14          So when Mr. Biss says, you know, Government, you haven't

15  identified who our investors are, so we can't really fully respond to

16  these requests, he's playing games, your Honor.  Again, the

17  Commission should not be prejudiced by these types of games,

18  particularly given the record of the AIC Defendants in terms of

19  document production.

20          We need some certainty that all documents relating to

21  communications with the investors to whom AIC sold securities,

22  meaning their promissory notes and their preferred and common

23  stock, that we have all of those communications.

24          Because we can expect at trial that Mr. Skaltsounis will get up

25  and make all kinds of generalized statements about what he told,

1    for instance, his lawyer, or what he told his investors. And we

2    ought to be able to test those by full discovery in this case.

3           And as is clear from Mr. Biss' December 24th e-mail message,

4    as well as other documents that we have been provided, some of

5    those documents reside at the apartment– the Richmond apartment

6    building; where, after the Commission launched its investigation,

7    the AIC Defendants jumbled together their documents from all

8    different corporate entities and put them in a position whereby the

9    Commission staff could not reasonably review them.

10          And I go back to the case that we cited in our motion to

11   compel, In re: Sulfuric Acid Antitrust Litigation. This is precisely

12   what Rule 34 was meant to avoid.  Putting aside the documents that

13   we can't even practicably review because they're in a place where

14   there's no place to review them– they're piled sky-high or

15   underneath a low overhead– the rest of the documents, they're not

16   kept in the usual course of business because the AIC isn't

17   conducting business anymore. So the AIC has no, no incentive to

18   keep them in an order that would facilitate their business practice.

19          So when the commission staff goes in, you know, we're

20   looking at documents that are not organized in any meaningful

21   way. We can't find– you know, if they actually were still

22   maintaining the documents in the usual course of business, they

23   would be able to go right over to the file, pull out the file, with the

24   minutes and the audiotapes, and hand them over to the Commission

25   staff, because that comports with what Ms. Tabar testified.

1       But, of course, because they're not maintaining the

2   documents in the usual course of business, and they've made no

3   effort to organize them according to the request that the

4   Commission has made, the Commission staff is left with looking

5   through what Mr. Biss has counted as about 275 boxes to try and

6   find audiotapes that, frankly, had the Defendants simply provided

7   at the time of the investigation, we wouldn't be in this situation

8   right now.

9       Plus we're talking about dozens of investors who purchased

10  these fraudulent securities. Their records are spread all over, you

11  know, AIC's files as well as Community Bankers Securities' files.

12  We need to have the documents that reflect communications with

13  those investors.

14      And it's very telling what Mr. Biss said in response to the

15  Commission's motion to compel discovery. He doesn't think

16  documents that he doesn't produce to the Commission he should be

17  precluded from using at trial. Again, this is yet another game.

18  These documents could be hidden in these boxes in a place where

19  Mr. Skaltsounis, on the eve of trial, could go find and pull out and

20  use against the Commission at trial if such documents existed.

21      We ought to have the opportunity to review the documents,

22  have document production provided to us that complies with Rule

23  34, and here that hasn't happened. The Commission staff should

24  not be prejudiced because of the mess that was created by the AIC

25  Defendants.

1    If they have documents evidencing communications with

2    investors, which Mr. Biss has essentially conceded in his

3    December 24th e-mail message, as well as in his supplemental

4    document request responses; if they have evidence relating to the

5    "advice of counsel" defense, which, again, we don't think has any

6    basis and we think is likely to be resolved before trial, or if they

7    have documents otherwise responsive to the Commission's

8    document requests, then they need to be provided to the

9    Commission.

10    We're far too far into this litigation to have a situation where

11    Mr. Biss has not even looked through, apparently, not even looked

12    through 275 boxes of documents that his clients decided, after the

13    investigation was launched, to shove into a Richmond apartment

14    building.

15    And one other thing I point out in terms of what happens next.

16    Obviously, what we want is an order that comports with the

17    proposed order that we provided to the Court. But if the audio tapes

18    which, you know, again, would be the best evidence of what

19    happened at the board meetings, to the extent that the board

20    meetings were recorded, if they don't produce these documents or

21    they don't produce the communications with investors, then we

22    think that there are some serious sanctions that ought to be

23    imposed here.

24    First of all, striking the affirmative defense of "advice of

25    counsel." The AIC Defendants cannot maintain that this advice

1    transpired at board meetings, and the type of advice that the AIC

2    Defendants have contended that Mr. Grant provided the board

3    meetings is not confirmed in any of the minutes of the board

4    meetings.

5         No other board member who's testified has testified

6    consistent with Mr. Skaltsounis. And, frankly, the defense ought to

7    be stricken or, at the very least, Mr. Skaltsounis ought to be

8    precluded from testifying about what happened at these board

9    meetings. Again, he can't say that certain things occurred while, at

10   the same time, failing to produce the audio recordings, the tapes. In

11   any event, the jury ought to be given an instruction on what

12   inferences they can draw from the spoliation of these documents.

13        So what we would ask for is what we asked for in our motion.

14   Number one, we need the documents that are in the AIC

15   Defendants' possession to be reviewed, copied and provided up to

16   the Commission staff, the documents that we already reviewed that

17   have been marked for copying we need to have access to. We

18   assume that nothing has been done with those documents that

19   would disturb the marking that we did to indicate which documents

20   we were interested in having scanned and copied.

21        In terms of document request responses, we need

22   confirmation that all of the documents that we have asked for in

23   these document requests have actually been produced to the

24   Commission. Obviously, we are going to set forth certain

25   deposition dates coming up, which we appreciate, your Honor.

1   And, again, not providing this relief to the Commission, given

2   what the claims are in this action and what the defenses are, would

3   severely prejudice the Commission.

4   You know, I would just say, in terms of the spoliation

5   inference, striking the defense, if Mr. Skaltsounis was testifying

6   truthfully about what advice he sought at the board meetings of

7   AIC, the conduct of the AIC Defendants with respect to those tapes

8   would have been much different.

9   They would have ran them in to the Commission when this

10  investigation was launched. At the very least, they would have

11  produced them to the Commission in response to the document

12  requests; because, after all, in Mr. Skaltsounis' view of the world,

13  they would be exculpatory. But that didn't happen. They weren't

14  produced. They didn't even mention them. We had to learn about

15  them from a third party. They refused to respond to inquiries about

16  them after Ms. Tabar's deposition.

17  And then the AIC Defendants' counsel represents to your

18  Honor, just before our discovery conference with your Honor, that

19  the tapes don't exist, only to be contradicted by his own client the

20  next day. And still, given the position that was raised way back in

21  October of last year, we're now sitting here in late February and

22  still no word about where the tapes are, except that they may or

23  may not exist and that the Commission, if it wishes, can go through

24  275 boxes of documents in no particular order, many of which are

25  practically inaccessible to the Commission.

1    Your Honor, we think that's outrageous, we think the

2    Commission will be prejudiced by that, and we think relief ought to

3    be imposed here.

4            THE COURT:   Well, you keep saying that these tapes

5    that exist, but the fact of the matter is, nobody knows whether they

6    exist or not, correct?

7            MR. RINALDI:   Your Honor, all we can do is go by–

8            THE COURT:   Yes or no? Nobody knows for sure,

9    right?

10           MR. RINALDI:   Yes. But that doesn't mean that they

11   were disposed of in the usual course of business.

12           THE COURT:   I didn't ask you that question.

13           MR. RINALDI:   Yes, they could have destroyed them

14   after the Commission launched its investigation. I absolutely agree

15   with that, your Honor.

16           THE COURT:   Wouldn't the Commission be more

17   confident that it had actually been given access to every possible

18   relevant document if the Commission looked for them itself?

19           MR. RINALDI:   Your Honor, if we went back–

20           THE COURT:   Wouldn't you rather have your own

21   people go through these boxes and look at these documents rather

22   than rely on someone you've accused of fraud to tell you what's in

23   the documents?

24           MR. RINALDI:   And, your Honor, we did precisely

25   that.  There were basically two sets of boxes of documents; one in

1   the unfinished basement room, which I went and looked through

2   every one of those boxes.

3            THE COURT:   I read your filing.

4            MR. RINALDI:    Yes. I went through and looked

5   through every one of those boxes. The boxes in the upstairs

6   property management office, there was no room to practicably

7   review them.

8        Now, if Mr. Biss' clients, at their expense, would move those

9   documents to a place where the Commission staff could review

10  them, mark whatever documents we want for copying, we would

11  happily provide a copy of that disk to Mr. Biss' clients so that he

12  has the benefit of any of the documents that we've identified.

13       But here's the thing.  If we come back and we don't find the

14  audio tapes, we think that there ought to be sanctions. Because the

15  testimony was that the tapes were kept in the usual course of

16  business, they were filed with the minutes; and if they're not there

17  anymore, Commission staff can't locate them, then you're right,

18  they don't exist anymore and there ought to be spoliation sanctions

19  imposed against the Defendants.

20       I have no problem– your Honor, I have spent so much time,

21  two days already in Richmond, with these documents, I don't have

22  a problem spending another two days with the boxes from the

23  property management office, as long as they're in a condition in

24  which I can review them. That's condition number one. They have

25  to be moved to a place where I can practicably review them. Mr.

1   Biss–

2           THE COURT:   What's wrong with that?

3           MR. RINALDI:   I don't think they're going to do it.

4           THE COURT:   Well we'll ask them and we'll find out.

5   How many boxes have you not yet looked at?

6           MR. RINALDI:   It's probably in the range of about a

7   hundred.

8           THE COURT:   Okay.  And couldn't those boxes be

9   loaded up by someone?

10          MR. RINALDI:   Yes.

11          THE COURT:   Could you hire some movers to take

12  them to a facility where people could go through them right?

13          MR. RINALDI:   Yes. If Mr. Biss could have those

14  boxes delivered to the SEC's office– we're not going to ask them to

15  bring them up to Philadelphia; we'll go down to Washington D.C.

16  He could bring them to those offices, we could review them.

17          THE COURT:   Why don't you just take them someplace

18  else in Richmond?

19          MR. RINALDI:   Wherever. The problem is, then, we're

20  going to have to have them transported to a place to have them

21  copied.

22          THE COURT:   So?

23          MR. RINALDI:   Okay. Fine. So if he wants to put them

24  in a place, another place in Richmond that's reasonable, where we

25  can go through the documents, we'll do that, number one. Because

1    the documents still are not organized in the manner consistent with

2    Rule 34, we take the position that those documents that we don't

3    identify for copying, he ought to be precluded from using at trial.

4         Because he has put us in the situation where relevant

5    documents could be squirreled away among documents that don't

6    appear relevant because they're not kept in the usual course of

7    business anymore. He and his clients have no interest in keeping

8    the documents in a way that facilitates the business activities of

9    AIC because there are no business activities of AIC.

10             THE COURT:   I understand that argument. I've heard

11   you on that. I'm simply asking you, is the Commission prepared

12   to, if given access to where these documents are–

13             MR. RINALDI:   Yes.

14             THE COURT:   –is the Commission prepared to simply

15   go in there, haul them all off down the street somewhere where

16   you're more comfortable, more room–

17             MR. RINALDI:   Yes.

18             THE COURT:   –go through all the documents–

19             MR. RINALDI:   Yes.

20             THE COURT:   –pull out what you want, copy what you

21   want, whatever you want, and then put them back?

22             MR. RINALDI:   Yes, we're prepared.

23             THE COURT:   Is the Commission prepared to do that?

24             MR. RINALDI:    We are prepared to do that. We're not

25   prepared to do that on that site. If he provides, at his expense, a

1   place to review them, we'll do that.

2           THE COURT:   Okay. I don't know any other way for

3   the Commission to be confident that they had access to everything.

4           MR. RINALDI:   Right. The question that we raised in

5   our papers, which, you know, we want to be clear on, is that if, at

6   the end of that process, we go through and do not find these tapes–

7           THE COURT:   That's another fight, for another day.

8           MR. RINALDI:   I understand that, your Honor, yes. As

9   the Commission has made clear over and over–

10          THE COURT:   I can't tell you how many cases people

11  have come in here and said, but, your Honor, the former secretary

12  who used to work their claims, there was this file or there was this

13  document or somebody got– sent us a letter, I saw it, it must be

14  somewhere, and then it never turns up. It happens routinely.

15          MR. RINALDI:   Your Honor, it's not just a former

16  secretary here. Mr. Skaltsounis himself testified that the meetings

17  were audio recorded.

18          THE COURT:   I understand that. I think there's been

19  no doubt– you told me it's conceded there were audio recordings.

20  The question is whether those recordings exist somewhere in a

21  physical state of being where you can listen to them.

22          MR. RINALDI:   Right. And the only testimony that we

23  have– we have multiple testimony on that. Ms. Tabar, who is the

24  former secretary, testified that they were–

25          THE COURT:   I understand, you have good reason to

1    think they may be in there. You've established that.

2            MR. RINALDI:   Right. And the other thing is, nobody

3    else has testified that they were destroyed.

4            THE COURT:   I understand.

5            MR. RINALDI:   Yes. So–

6            THE COURT:   I understand. But until you've looked in

7    every nook and cranny, in every box.

8            MR. RINALDI:   And we are absolutely prepared to do

9    that, your Honor.

10           THE COURT:   All right. That's all I wanted to know. I

11   don't preface that question by making any finding that the

12   documents have been produced as required by Rule 34.  I'm simply

13   asking you, as a practical matter, is the Commission prepared to do

14   what I asked you?

15           MR. RINALDI:   And the reason I throw in the caveats

16   regarding the preclusion of other documents and things like that is

17   that the Commission staff has really gone out of its way to avoid

18   today's hearing and the filing of this motion to compel. I did not

19   want to have to file this motion to compel. I didn't want to be in

20   front of the Court today.

21           But we don't want to be in a position where our willingness to

22   go out and do something that your Honor is suggesting that we

23   might do would lead to a circumstance that, because of the

24   organization of the documents, we don't look at a particular file as

25   one that's– because, obviously, we can't look through every single

1       page of, you know, 100 boxes of documents. We need to–

2               THE COURT:   Well, ultimately– I understand your

3       concern.

4               MR. RINALDI:   Right.

5               THE COURT:   But this is federal court. Documents are

6       required to be produced, marked, exchanged, before trial.

7               MR. RINALDI:   Yes.

8               THE COURT:   Your requests are certainly broad

9       enough to cover any potential document like that.

10              MR. RINALDI:   Okay.

11              THE COURT:   Okay.  So there are not going to be any

12      surprises at trial where the Defendants are going to pull out a file,

13      well, here are our investor communications right here, which

14      you've never seen before, Commission, but now we're going to put

15      them into evidence here in front of the jury. That's not going to

16      happen.

17              MR. RINALDI:   That's what we want to be assured of.

18              THE COURT:   Well, okay.

19              MR. RINALDI:   Yes. And that's–

20              THE COURT:   We don't do things that way.

21              MR. RINALDI:   I understand that, your Honor.

22              THE COURT:   All right.  Anything else?

23              MR. RINALDI:   No, your Honor. Obviously, we

24      reserve the right to come back and address any other points.

25              THE COURT:   I'll let you have the last word.

1                    MR. RINALDI:   Thank you, your Honor.

2                    THE COURT:   All right.  Mr. Biss, you've sat patiently,

3       and that's always hard to do in a long hearing.

4                    MR. BISS:   Judge Guyton, good morning, sir.

5                    THE COURT:   Good morning.

6                    MR. BISS:   Steve Biss for the Defendants and the

7       Relief Defendants in this case. As the Court notes, this is Heather

8       Anderson, my co-counsel.

9              Judge, I'm going to try to cut right to the chase on the

10      documents. We agree with your Honor's proposed handling of the

11      documents in the storage facility, apartment complex, whatever we

12      want to call the facility where the documents are.  The documents

13      can be retrieved by the SEC, taken to a neutral location in

14      Richmond, reviewed, and returned at their leisure. They can review

15      them and copy them and return them at their leisure.

16              With regard to the audiotapes, the only additional piece of

17      evidence or revelation with regard to these audiotapes is the

18      deposition of Paula Collier, who was the secretary of AIC, and she

19      was also a member of the board of directors.  She was also an

20      officer and director of Community Bankers Securities, one of the

21      other defendants.

22              On February 7 she testified– she was asked questions by Mr.

23      Rinaldi, and she testified that, in fact, there were no audiotapes–

24      audio recordings of the later AIC board meetings, but that some of

25      the older meetings there were audio recordings, some of the older

1    meetings.

2          But nobody, Judge, can tell you what meetings were recorded,

3    what meetings were not recorded, when the meetings were recorded

4    or when they stopped being recorded; not even the secretary of

5    AIC.

6          Now, we produced, as I think Mr. Rinaldi would concede, we

7    produced all of the minutes of every corporate defendant and relief

8    defendant, complete copies of the minute books.  Mr. Rinaldi says

9    that the authenticated minutes of AIC do not reveal any legal

10   advice that was given, and that's something we can argue about

11   later.

12         Mr. Rinaldi took the deposition, has taken the deposition, I

13   think, now, of virtually all the board members.  This wasn't just a

14   company run by Nicholas Skaltsounis. As the Court may gather

15   from some of the pleadings, there were seven, sometimes seven,

16   members of this board of directors, including Mr. Skaltsounis; Mr.

17   Grant, the lawyer at Troutman Sanders; Paula Collier, Douglas

18   Mussler; Thomas Miller, who is a retired Air Force colonel, banker

19   down in South Carolina. There were a lot of individuals on this

20   board, not just Mr. Skaltsounis.

21         Mr. Mussler testified at his deposition that legal advice was

22   given at the board meetings.  And, Judge, the best evidence of legal

23   advice given at the board meetings is the authenticated minutes

24   prepared by the secretary of the corporation, Paula Collier, and

25   approved by the board of directors.

1    Mr. Skaltsounis has testified to, in response to questions, tell

2    me all the legal advice that was ever given to you by Troutman

3    Sanders in connection with the offering of AIC Investments, and

4    that's a very, very broad question. Because Troutman Sanders, the

5    law firm, represented AIC for a period of time from 2000 all the

6    way to 2009.

7    And what we have done in the course of discovery is, we've

8    waived the attorney-client privilege and Troutman Sanders has

9    produced either 27,000 documents, or 27,000 pages, the entire

10    client file spanning ten years. We've produced every invoice

11    evidencing every communication that was billed by Troutman

12    Sanders.

13    THE COURT:   Is there an issue about that?

14    MR. BISS:   There really isn't.  I'm just responding to

15    some of the things that Mr. Rinaldi said about no testimony about

16    legal advice.

17    THE COURT:   Okay.  Well, I don't need to hear it.

18    We're not going to rule on whether or not that's a valid defense

19    today.

20    MR. BISS:   I understand. This thing that's been called

21    the Tabar file, Judge, there is no Tabar file, Ms. Della Tabar.

22    There is no Tabar file. We've produced everything that AIC has in

23    its possession or control, anything that was ever given to investors.

24    We have produced everything. And so I don't know. Mr. Rinaldi

25    has now called it the Tabar file, but that's not– there is no file.

1        Deposition dates, Judge, in my reply I simply ask the Court

2    to– I've done everything I can to try to get dates set for

3    depositions. I've given, and our brief sets forth, the number of

4    times I have provided available dates.

5        THE COURT:   Well, let me ask you this on that,

6    because it seems like we've got enough dates set right now to get

7    these depositions well on their way.  Is there some deposition you

8    are requesting that hasn't been scheduled?

9        MR. BISS:   Yes. Judge, the only depositions that I

10   intend to take in this case are the depositions of Troutman Sanders,

11   and I believe their corporate representative would be Tom Grant.  I

12   have communicated with Mr. Rinaldi about this several times.

13       I've also contacted counsel for Troutman at Venable LLP, a

14   gentleman by the name of Bill Dolan, and Mr. Dolan and I are

15   working on coordinating dates now.  And I've asked Mr. Rinaldi to

16   provide his available dates for the deposition of Troutman Sanders.

17       I also intend to take the deposition of the CPA for AIC and

18   several of the Relief Defendants, Keiter Stephens.  Mr. Rinaldi

19   may be taking that deposition too. And then the other deposition I

20   intend to take is the deposition of FINRA. I intend to notice a

21   corporate deposition, a 30(b)(6) deposition, of FINRA.  So those

22   are the three depositions that I believe I will take in this case.

23       I have supplied almost the entire month of April, available

24   dates.  Mr. Rinaldi alluded to a few of them.  There are other dates

25   in April.

1      But, Judge, on the depositions, the depositions of every

2  witness that Mr. Rinaldi has taken, they go the whole day, without

3  question. I'm not sure that the six dates that the Court has set aside

4  today, I'm not sure that it's going to be enough, given the pace of

5  the depositions. I don't know how else to do it, but–

6      THE COURT:   Well, if they're not enough, get on the

7  phone, Ms. Anderson on the phone. She'll mediate this situation,

8  won't you, Ms. Anderson?

9      MS. ANDERSON:   I will.

10      THE COURT:   She's good at getting things done,

11  getting things scheduled. Just get on the phone and set them. You

12  shouldn't have to come to court to set deposition dates.

13      MR. BISS:   I agree.

14      THE COURT:   I just want to get a feel for how many

15  you want to take.  You're saying three?

16      MR. BISS:   Just three.

17      THE COURT:   Okay.  And Mr. Rinaldi, if his

18  depositions take all day, I mean, that's fine.  I'm sort of surprised

19  you can take one in a day in this case, but that's fine.  Do you think

20  he's dragging them out unnecessarily?

21      MR. BISS:   Judge, I really– it's really not–

22      THE COURT:   If you do, I would want you to address

23  your concern to opposing counsel and you all discuss it.

24      MR. BISS:   Yeah.  I have–

25      THE COURT:   I mean, what's the point of making it

1    last longer than it has to?

2           MR. BISS:   Judge, I have attempted to address this

3    issue with Mr. Rinaldi a few times.  One of the reasons that I have

4    insisted on written communications is, I don't want to have to deal

5    with the accusatory nature of these phone calls. These phone calls

6    are very unpleasant, and I don't have enough time at the end of the

7    day to deal with the type of what I believe to be incendiary.

8           Mr. Rinaldi disagrees with me, but it's not pleasant, and I

9    would prefer to have pleasant conversations.

10           THE COURT:   I understand. Some lawyers come in and

11    say, look, we don't communicate well, we're having problems with

12    tone and content of our communications.  That's why I suggested

13    Ms. Anderson could help you, your local counsel.  Everyone gets

14    along with Ms. Anderson, from what I can tell, based on her

15    practice.

16           Get your local counsel to set these things up if you need to.

17    But she's of record, she can communicate with Mr. Rinaldi.  I'm

18    not saying it's your fault. I'm just saying in order to get the things

19    scheduled let's use all our available resources.  I'm not saying

20    you're at fault or Mr. Rinaldi's at fault. Obviously, this is a

21    zealously advocated lawsuit that's going on here.  But it has to get

22    prepared; if it's going to go to trial, it has to get prepared.

23           The district judge is not going to want to hear about how the

24    case is not ready because no one could agree on deposition dates.

25    Do you know what I'm saying?

1          MR. BISS:   I agree, Judge.

2          THE COURT:   Things move along now in this district.

3          MR. BISS:   We need to get them scheduled.  They

4    filed– they commenced their investigation in '09; they filed the

5    lawsuit in 2011, and they identify all these investors.  We're still

6    no further along in this process in identifying who the complaining

7    investors are.  We still don't have any identification of them.

8          There's allusions to who the investors are based on

9    documents shown to witnesses in depositions, but we still don't

10   have an identification.

11         THE COURT:   Well, if that's something you feel like

12   you're entitled to and that you've requested and that you haven't

13   received, I would ask you to file a motion.

14         MR. BISS:   Yeah, I will. I mean, we're not here for that

15   today, but–

16         THE COURT:   No, we're not.  I'm not going to take up

17   anything other than this motion today, but I'm simply saying, if it's

18   something you can't work out, file a motion. But we're going to

19   keep this case on schedule.

20         MR. BISS:   Judge, I would ask the Court to set a few of

21   the dates I provided yesterday, the updated deposition schedule

22   dates. I would ask the Court to order five more days. That way we

23   have a clear understanding, both parties, we need to set them on

24   these days, and there's no– I do think my only request today is we

25   have five more days so that Mr. Rinaldi chooses the depositions

1    and sets them. I'd like to get that done so we don't argue about this

2    anymore.

3              THE COURT:   Well, are these dates that you want to

4    use or dates that you want him to use?

5              MR. BISS:   Well, again, I gave him all of my available

6    dates, and I do recognize he probably has other cases he's working

7    on, too.  So I asked him yesterday, let me know your availability so

8    that we can coordinate the dates and get them– get depositions set

9    on dates we're both available.

10             THE COURT:   All right.  Well, the last date I set was,

11   I've set aside April 19th.  What would you suggest for the next

12   dates?

13             MR. BISS:   Judge, I don't have– Mr. Rinaldi has my e-

14   mail. He can just read the dates off. They're all still available. I

15   sent this yesterday.

16             THE COURT:   Well, we'll ask him. He gets the last

17   word today, anyway, so we'll ask him.

18             MR. BISS:   Thank you, your Honor.

19             THE COURT:   Anything else, sir?

20             MR. BISS:   Judge, nothing, other than, I mean, I think–

21   I don't want to rehash everything I've put in my brief.  The only

22   point on the audiotapes was to bring to the Court's attention the

23   testimony of Paula Collier.

24        That's the only new development in this mystery of these

25   audiotapes, is that only older meetings, whatever that means,

1  whatever "older meetings" means, and Ms. Collier couldn't

2  identify which older meetings were taped. But she said none of the

3  newer meetings, or not older meetings, were taped. And she would

4  know, because she's the secretary of the corporation.

5          THE COURT:  Okay. I understand.

6          MR. BISS:   That's all I wanted to bring to your

7  Honor's attention.

8          THE COURT:   Well, the tapes are either in the boxes or

9  they're not, and if they're not in the boxes, the Court will order

10 that no tapes can be used at trial. Will that satisfy everyone?

11         MR. BISS:   Yes, sir.

12         MR. RINALDI:   Your Honor, obviously, except, the

13 tapes aren't found, we reserve the right to seek other spoliation

14 sanctions, but I'm not going to rehash that, your Honor.

15     The other issue is, Mr. Biss has talked about the documents

16 that he's provided to us. There are still several financial records

17 that still haven't been provided. We don't have the general ledgers

18 for the Defendant, CBS Advisors, we don't have the updated

19 general ledgers. These were produced during the SEC's activity

20 back in 2009.

21     We need whatever other general ledgers there are for any of

22 the Defendants and Relief Defendants. We don't have the 2009

23 financial statements for Community Bankers Securities. We don't

24 have financials from 2005 for Community Bankers Securities.

25 AIC's income statement from 2004, we don't have statements of

1    cash flow.

2          And just recently, in the supplemental document request

3    responses that we got, Mr. Biss' calling into question activities

4    from 2003 and 2004. Well, we need those financial records as well.

5    So we'd ask that they either be produced– obviously, we'll look for

6    them as well in the remaining boxes in the apartment building. But

7    those are documents that we need to have produced, and we don't

8    think that there would be any objection with respect to that.

9          As to the audiotapes, I'll just briefly say, with respect to Ms.

10   Collier, first of all, Ms. Tabar, who was the secretary, didn't leave

11   until 2007. She was recording the meetings up until the time that

12   she left.

13         And, frankly, to the extent that the tapes relate to the "advice

14   of counsel" defense, what happened during these earlier meetings–

15   which, by the way, are still during the relevant period– would

16   likely be the more relevant ones. You usually ask your attorney for

17   advice about whether to do something before you do it for the first

18   time, not after you've done it 17 times.

19         So despite what Mr. Biss is saying, the tapes certainly are

20   relevant not only to the Commission's case-in-chief, but whatever

21   affirmative defenses–

22               THE COURT:   There's no objection that you're entitled

23   to them.

24               MR. RINALDI:   Yes, yes.

25               THE COURT:   So what's next?

1      MR. RINALDI:   As to the fraud,– he mentioned about

2  the fraud question regarding the "advice of counsel" defense. All I

3  would say is, we asked in interrogatories what the advice of

4  counsel was, and various categories were set forth.

5      We've gone through each one of those categories. We didn't

6  just ask what advice did you seek or receive. We went through each

7  of those categories, and, despite that, we have no specifics about

8  the communications. So this is not a circumstance where the

9  Commission is asking for duplicative or cumulative discovery. We

10  just haven't gotten the answer from AIC's president, Mr.

11  Skaltsounis.

12      Frankly, we think, for that reason, this "advice of counsel"

13  defense is likely to be resolved before trial. But that's all the

14  Government has, your Honor.

15      THE COURT:   All right.  What are the deposition

16  dates?

17      MR. RINALDI:   Oh, yes. I'm sorry. He also provided

18  the 22nd, 23rd, 24th, 25th, 26th and 29th–

19      THE COURT:   Slow down, slow down.

20      MR. RINALDI:   I'm sorry.

21      THE COURT:   Hold on. This is April, correct?

22      MR. RINALDI:   Yes, your Honor.

23      THE COURT:   What are the dates?

24      MR. RINALDI:   22nd, 23rd, 24th, 25th, 26th, 29th and 30th.

25  And, your Honor, obviously, you know, I'm not going to commit to

1   taking a deposition on every one of these days.  One of the

2   deponents is in Florida. There may be days where I have to travel.

3          So, you know, if all these dates will remain open, we will

4   promptly try to get a deposition scheduled for as many of these

5   dates as possible and work with Mr. Biss, work with Ms. Anderson,

6   constructively to get that done.

7                      THE COURT:  Okay.

8                      MR. RINALDI:    Thank you, your Honor.

9                      THE COURT:    All right.  Mr. Biss, is there anything

10  else, although I'll warn you, if you say anything else I'll have to

11  give him another shot.

12                     MR. BISS:    Just a point of clarification, your Honor.

13  My clients don't have any money to pay to have these boxes

14  retrieved by the Commission and taken to a neutral location. And I

15  just wanted clarification from the Court; that was at the Plaintiff's

16  expense as opposed to the Defendants' expense?

17                     THE COURT:    What I'm asked him was, the

18  Commission get the boxes, load them up, and move them.

19                     MR. BISS:   Yes, sir.  Thank you.

20                     MR. RINALDI:    And, your Honor, I would just say–

21                     THE COURT:    And add it on the cost in the case.

22                     MR. RINALDI:    Yes. The idea that the Defendants and

23  Relief Defendants have no money and can't bear this expense is

24  nonsense. The Relief Defendant, Allied Beacon Partners, is,

25  apparently from their website, an operating broker-dealer. They

1    have net capital requirement. They have to have some funds

2    available.

3          Obviously, paying for the services of Mr. Biss and Ms.

4    Anderson, I assume that their services are not coming for free. And

5    they're an operating a broker-dealer, and Relief Defendant Allied

6    Beacon Wealth Management, apparently is an operating investment

7    advisor.

8          The Commission has been put in this position by the

9    Defendants and Relief Defendants. The Commission and, by

10   extension, the taxpayers of the United States of America should not

11   have to pay for the expense of moving these documents to a place

12   where I can spend maybe another two days reviewing them.  We

13   think that's outrageous, your Honor.  Thank you, your Honor.

14          THE COURT:   The Court doesn't think it's an

15   outrageous suggestion that the Court has made, but I note your

16   objection.

17          MR. RINALDI:   Oh, no. I'm sorry. Your Honor, the

18   outrage– what I was saying was outrageous was the idea that the

19   Commission would have to bear the expense. We have no problems

20   moving them to a neutral location and reviewing them. We think

21   your Honor's suggestion is perfectly fine.

22          What we find outrageous is Mr. Biss' suggestion that his

23   clients don't have any funds to pay for the removing of these

24   documents and that those expenses ought to be borne by the

25   Commission.  That's what we find to be outrageous, your Honor.

1       THE COURT:   All right. I understand that. Thank you

2   for that clarification. My concern is that the Court doesn't want to

3   have to conduct a mini-trial over what the Defendants can afford or

4   not afford and so forth. There's a mechanism by which Plaintiff

5   Commission could bear some of these costs up front and then

6   there's a mechanism by which the Court could award those costs,

7   which need to be documented, as part of any final judgment in the

8   case, sanctions that may arise, or whatever, if the Plaintiff should

9   prevail.

10      So there's cost-shifting that can go on during the litigation. It

11  doesn't all have to be everyone going dutch from the very

12  beginning; okay? Do you know what I'm saying?

13      MR. RINALDI:   I do.

14      THE COURT:   Okay.  And I'm not saying the Court's

15  going to order that, but I'm not sure I can think of another way that

16  the Commission can be satisfied that, in fact, it had access to all the

17  documents that were there.

18      All right.  Is there any other matter which either party

19  believes should be brought before the Court today or should have

20  been brought before the Court today? Mr. Rinaldi?

21      MR. RINALDI:   No, your Honor. Thank you.

22      THE COURT:   Mr. Biss?

23      MR. BISS:   No, sir.

24      THE COURT:   Ms. Anderson, I'm not ignoring you

25  completely, but I assume if you had anything to add you would

1    convey it, correct?

2                    MS. ANDERSON:   Yes, your Honor, I would.

3                    THE COURT:   All right.  Thank you very much,

4    counsel. Appreciate your arguments today.  They have been very

5    helpful. Madam Clerk, we'll be in recess.

6          (Hearing concluded at 10:34 a.m.)

# C E R T I F I C A T I O N

I certify that the foregoing is an accurate transcript of the record of proceedings in the titled matter.

_/s/Donnetta Kocuba_                                        _3/13/13_

Donnetta Kocuba, RPR-RMR
Official Court Reporter
U.S. District Court
Knoxville, Tennessee