UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| SECURITES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:11-CV-176 |
| | ) | (VARLAN/GUYTON) |
| AIC, INC., COMMUNITY BANKERS | ) | |
| SECURITIES, LLC, and | ) | |
| NICHOLAS D. SKALTSOUNIS, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALLIED BEACON PARTNERS, INC., | ) | |
| (f/k/a Waterford Investment Services, Inc.), | ) | |
| ADVENT SECURITIES, INC., and ALLIED | ) | |
| BEACON WEALTH MANAGEMENT, LLC | ) | |
| (f/k/a CBS Advisors, LLC), | ) | |
| | ) | |
| Relief Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

This matter is before the Court on plaintiff Securities and Exchange Commission's

("SEC") Motion for Partial Summary Judgment [Doc. 93], in which the SEC moves the

Court to grant summary judgment against defendants AIC, Inc. ("AIC"), Community

Bankers Securities, LLC ("CB Securities"), and Nicholas D. Skaltsounis ("Skaltsounis")

(collectively, "AIC defendants") on the AIC defendants' estoppel, waiver, unclean hands,

and advice of counsel defenses to the SEC's claims, and also moves the Court to grant

summary judgment against the AIC defendants for violating §§ 5(a) and 5(c) of the

Securities Act of 1933, 15 U.S.C. §§ 77e(a) & (c). In addition, the SEC seeks summary judgment against the relief defendants in this matter, Allied Beacon Partners, Inc., Advent Securities, Inc. ("Advent"), and Allied Beacon Wealth Management ("ABWM") (collectively, "relief defendants"), on its disgorgement claim, contingent upon a finding of liability against the AIC defendants. The AIC defendants and relief defendants submitted a response [Doc. 98], to which the SEC submitted a reply [Doc. 101]. The parties have also submitted various affidavits and exhibits in support of their respective positions. Having considered the arguments of the parties, in light of the record in this case and the prevailing case law, the SEC's motion will be granted.

## I.    Relevant Background

This dispute arises from the offering of promissory notes and stock in AIC, a Virginia-based holding company for several registered broker-dealers (co-defendant CB Securities and relief defendants Allied Beacon Partners, and Advent), and a state-registered investment adviser (ABWM), by the AIC defendants from 2006 through 2009 [Doc. 65 ¶ 13]. CB Securities, a registered broker-dealer with the SEC until 2009, employed independent brokers throughout the country, including an office located in Maryville, Tennessee [*Id.* ¶ 14]. At all times relevant to this matter AIC owned an eighty-eight percent interest in CB Securities [*Id.*]. Similarly, AIC owned a ninety percent interest in ABWM (formerly known as CBS Advisors), Allied Beacon Partners (formerly known as Waterford Investment Services, or "Waterford"), and Advent, all of

which were registered in Tennessee, among other states, to sell securities [*Id.* ¶¶ 18-20].[1] Co-defendant Skaltsounis founded AIC in 2000, and during the period in question, served as AIC's president and CEO and held similar positions in CB Securities, Advent, and CBS Advisors, in addition to serving as Chairman of the Board of Directors of Waterford [*Id.* ¶ 15]. The SEC alleges that the AIC defendants orchestrated an offering fraud that defrauded investors of millions of dollars in multiple states, with the proceeds distributed amongst the AIC defendants and to the relief defendants.

As neither AIC nor its subsidiaries were profitable, AIC had a constant need for capital in order to fund their operations, which AIC met by offering and issuing securities in the form of promissory notes as well as common and preferred stock [*Id.* ¶¶ 23-25]. Through sales of both notes and stock, AIC raised over $7 million from at least seventy-four investors in fourteen states during the relevant time period [Doc. 65 ¶ 29]. The SEC claims that in the process of offering and selling these securities, the AIC defendants made material misrepresentations about AIC's business and omitted disclosures regarding the risks associated with investing [Doc. 94-1 at 5].[2] As set forth in the SEC's brief in support of its motion for summary judgment, potential note holders would receive the relevant promissory note, stockholders would receive a subscription agreement, and occasionally, the AIC defendants would use other material to solicit investors, such as

---

[1] The parties do not dispute that all four entities associated with AIC were operated as subsidiaries of AIC.

[2] These omissions include the fact that AIC had never been profitable, that AIC had no revenue from business operations, and that AIC's ability to pay returns to investors was dependent upon attracting new investors [Doc. 94-1 at 5].

3

executive summaries, which also contained material misstatements and omissions [*Id.* at 6]. These investments were sold without a registration statement in effect as to AIC, as required by the Securities Act of 1933. In order to maintain the fraud, the SEC claims, the AIC defendants induced investors to reinvest or renew their AIC investments, making further misstatements in the process. As a result, many of these investors did reinvest their funds by rolling over their investments into new promissory notes. Of the funds raised, $948,389 was distributed to Skaltsounis, approximately $2.8 million was distributed to CB Securities, and approximately $1 million was distributed to the relief defendants [*Id.* at 7]. In its First Amended Complaint, the SEC alleges that another $2.5 million of new investor funds were distributed back to investors, so that the fraud was operated as a Ponzi scheme [Doc. 65 ¶ 32].

The SEC commenced this civil enforcement action in 2011, and in its First Amended Complaint claims numerous violations of the federal securities laws, including: (1) violations of § 5 of the Securities Act of 1933 for selling unregistered, non-exempt securities without proper registration as to the AIC defendants; (2) violations of § 17 of the Securities Act for offering and selling securities by fraudulent means as to the AIC defendants; and (3) violations of § 10(b) of the Exchange Act of 1934, and Rule 10b-5 thereunder, for engaging in fraud in connection with the sale of AIC's securities as to the

4

AIC defendants.[3]  The Commission seeks permanent injunctive relief against the AIC defendants as well as disgorgement from both the AIC and relief defendants.

## II.  Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing that no genuine issues of material fact exist.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993).  All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).  "Once the moving party presents evidence sufficient to support a motion under Rule 56, the non-moving party is not entitled to a trial merely on the basis of allegations."  *Curtis Through Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Catrett*, 477 U.S. at 317).  To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The genuine issue must also

---

[3] The SEC has settled all claims with defendants Graves and Guyette [Docs. 146, 156]. The SEC has also brought additional claims against AIC, CB Securities, and Skaltsounis for their specific roles in the alleged scheme [Doc. 65 ¶¶ 107-119].

5

be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

III.    **Analysis**

A.      **The AIC Defendants' Affirmative Defenses**

In their amended answer [Doc. 84], the AIC defendants assert several affirmative defenses to some or all of the SEC's claims. First, the AIC defendants claim that the SEC's claims "are barred, in whole or part, by the doctrines of unclean hands, waiver, and estoppel" [*Id.* at 5]. Second, the AIC defendants claim that they relied upon the advice of counsel during the offer and sale of all AIC investment products. In support of their motion for summary judgment, the SEC claims that, in light of the evidence of

6

record, the AIC defendants cannot create a genuine issue of material fact as to the availability of any of the asserted defenses.

### 1.    Equitable Defenses of Estoppel, Waiver, and Unclean Hands[4]

The AIC defendants base their defenses of estoppel, waiver, and unclean hands on the SEC's conduct and statements made while examining the relevant companies at issue prior to the investigation in this case, as well as conduct and statements made during the course of the investigation which led to the filing of this action. The AIC defendants contend that the SEC knew that AIC was raising capital through the issuance of debt and equity, and that the SEC, along with the Financial Industry Regulatory Authority ("FINRA"), and its predecessor, the National Association of Securities Dealers ("NASD"), approved these transactions. In doing so, the AIC defendants argue, the SEC waived its ability to file suit based upon any shortcomings in the transactions. The AIC defendants submit that their estoppel defense is similarly based on the fact that during the course of a 2006 audit of CB Securities, the SEC represented that "everything was fine," and did so again in 2009 during the investigation of AIC that led to the present action [Doc. 98 at 10]. The AIC defendants also rely upon the fact that during this time period, the SEC did not take any action with regards to various reports and audited financial statements received from AIC and its subsidiaries. AIC believed that the SEC's lack of pointing out deficiencies and other lack of action constituted approval of AIC's stock and note offerings [Doc. 96-10 at 7-12].

---

[4] Given the overlap of both the factual bases and legal analysis for these defenses, the Court will address them together.

Waiver has generally been defined as the "the voluntary relinquishment by a party of a known right." *Chattem, Inc. v. Provident Life & Accidental Ins. Co.*, 676 S.W.2d. 953, 955 (Tenn. 1984) (citation omitted). To constitute a waiver of a benefit there must be clear, unequivocal, and decisive acts of the party showing an intention not to have the benefit/right conferred. *Jenkins Subway, Inc., v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1999). Waiver may be proved by any number of ways, including the following: express declarations; acts and declarations manifesting an intent not to claim the benefit; a course of acts and conduct; or "by so neglecting and failing to act, as to induce a belief that it was the party's intention and purpose to waive." *Id.* (quotation omitted). While waiver represents an intentional relinquishment of a known right, estoppel involves a misrepresentation relied upon by another to his detriment. *Id.* at 723. The elements of estoppel include: (1) words or actions that amount to a false or misleading representation by the party against whom estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party asserting estoppel; and (3) a detriment or "deleterious change" to the party asserting estoppel. *Id.*; *see, e.g. Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004); *see also Kosakow v. New Rochelle Raidology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001) (noting that the doctrine of equitable estoppel applies when "the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct"). The doctrine of unclean hands similarly may be used "'to deny injunctive relief where the party applying for such relief is guilty of conduct involving

8

fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party.'" *Performance Unltd., Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995) (quoting *Novus Franchising, Inc. v. Taylor*, 795 F. Supp. 122, 126 (M.D. Pa.1992)). The party claiming an equitable defense has the burden of proving it by a preponderance of the evidence. *Jenkins Subway*, 990 S.W.3d at 722, 723.

In general "equitable defenses against government agencies are strictly limited." *SEC v. Elecs. Warehouse, Inc.*, 689 F. Supp. 53, 73 (D. Conn. 1988). With respect to the estoppel defense in particular, although the SEC must treat those subject to its regulation fairly, "'the government may not be estopped on the same terms as any other litigant.'" *SEC v. Blavin*, 760 F.2d 706, 712 (6th Cir. 1985) (quoting *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60 (1984)). This principle stems from "the interest of the citizenry as a whole in obedience to the rule of law." *Heckler*, 467 U.S. at 60. "The doctrine of equitable estoppel is not available against the government except in the most serious of circumstances, and is applied with the utmost caution and restraint." *Rojas-Reyes v. INS*, 235 F.3d 115, 126 (2d Cir. 2000). In *Graham v. SEC*, 222 F.3d 994 (2d Cir. 2000), where the SEC had initially reviewed a company's activities before later conducting an investigation which led to the filing of a complaint, the Second Circuit noted that "the SEC's failure to prosecute at an earlier stage does not estop the agency from proceeding once it finally accumulated sufficient evidence to do so," *id.* at 1008. *See, e.g. Investors Research Corp. v. SEC*, 628 F.2d 168, 174 (D.C. Cir. 1980) (noting that, when specific facts of improper activity were not revealed until later, the fact that the SEC was aware of

9

transactions was insufficient basis for estoppel defense).  Courts have applied these same principles with respect to the waiver defense.  *See SEC v. KPMG*, No. 03 Civ. 671, 2003 WL 21976733, at *3 (S.D.N.Y. 2003) (noting that conversations between SEC and defendant were "insufficient as a matter of law to reflect an intentional relinquishment by the SEC of its right and duty under the law to file charges when it finds that charges are appropriate under the laws passed by the Congress").  Similarly, courts addressing the availability of the unclean hand defense have limited its application, finding that in order for a party to rely upon the defense "the SEC's misconduct must be egregious, the misconduct must occur before the SEC files the enforcement action, and the misconduct must result in prejudice to the defense of the enforcement action that rises to a constitutional level and is established through a direct nexus between the misconduct and the constitutional injury."  *SEC v. Cuban*, 798 F. Supp. 2d 783, 794 (N.D. Tex. 2011) (citing cases).

The AIC defendants assert that the defenses of waiver and estoppel are available in this case based upon the SEC's 2006 audit of CB Securities, the SEC's investigation/examination of AIC in 2009 (which served as the genesis of the current action), and various filings AIC and its subsidiaries made with the SEC and FINRA, including Form D filings, FOCUS reports, and audited financial statements.[5]  Upon

---

[5] The Court notes that to the extent the AIC defendants seek to rely upon their dealings with FINRA or the NASD to act as a waiver or estoppel on the part of the SEC, such reliance is meritless, as FINRA is a private, non-profit corporation which conducts its own investigatory and disciplinary actions, and is independent from the SEC. *See Graham*, 222 F.3d at 1007 n.25 (noting the same in describing the NASD).

10

reviewing the material, and the relevant deposition testimony related to them, however, the Court concludes that these cannot serve as the basis for a waiver or estoppel defense in this case.

In June 2006, the SEC conducted a broker-dealer examination of CB Securities and discovered several violations of the rules pertaining to the Exchange Act and rules of the National Association of Securities Dealers ("NASD"), the predecessor to FINRA, as noted in a letter from the SEC sent to Skaltsounis [Doc. 96-11]. The examination did not involve CB Securities' involvement in the sale of AIC stock and notes, and none of the violations involve the sale of securities at issue in this case. One violation pertains to continuing education for CB Securities' representatives, while the other two addressed various items used in calculating the firm's net capital [*Id.* at 2]. The end of the report includes several statements and disclaimers related to the investigation. The first indicates that the findings in the letter are "based on the staff's examination, and are not findings or conclusions of the Commission" [*Id.*]. The letter also warns to "not assume that your firm's activities not discussed in this letter are in full compliance with the federal securities laws or other applicable obligations" [*Id.*]. Given the letter's subject matter, pertaining to the examination of an AIC subsidiary at the beginning of the offerings in question, and the disclaimers contained therein, the Court concludes that there is nothing from the 2006 examination indicating a voluntary relinquishment of the SEC's ability to bring suit for violations of various statutory provisions of the Securities and Exchange Acts for the purposes of waiver. The AIC defendants have also not

11

presented any argument or evidence that this letter constitutes a misrepresentation sufficient for estoppel, when the letter issued at the beginning of the relevant time period does not reference the sale of securities or promissory notes in question and contains express language that it is not a final decision does not pertain to activities not discussed in the letter. Thus, the 2006 examination of CB Securities cannot serve as the basis for the equitable defenses asserted by the AIC defendants.

In late 2009, the SEC visited AIC and conducted an investigation pertaining to the offering of securities that culminated in the filing of the instant complaint. During the visit, Skaltsounis testified that the analysts made several statements that the SEC "didn't find anything alarming or out of whack," that AIC "was in good shape" [Doc. 96-10 at 8] and similar comments. AIC's Executive Vice President at the time, Paula Collier, similarly stated that the SEC's analysts present claimed they "really [were] not finding anything" [Doc. 96-12 at 4]. In addition, however, Collier testified that she never received express approval of the securities offerings by the SEC, and that the analysts informed her that they were not finished with their examination [*Id.*].

The facts of this case are analogous to the facts at issue in *KPMG*, a case involving violations of the securities laws in connection with audits conducted by the defendant, 2003 WL 21976733 at *1. During the course of an SEC investigation, the SEC had shown the defendant several documents pertaining to its client, the Xerox Corporation, which prompted a meeting and several communications between the defendant and the SEC. The SEC did not advise the defendant of any problems with Xerox's accounting

12

methodology, and in response to an inquiry by the defendant of whether there were other issues needed to be addressed, the SEC answered that the defendant had "hit them all." *Id.* When the defendant attempted to raise these conversations as a defense based on waiver or estoppel, the court granted the SEC's motion to strike, finding that the statements did not indicate that the SEC would not bring a civil suit, or that the SEC was waiving its right to bring such a suit. *Id.* at *3. The court noted that "the SEC must be able to conduct reasonable investigations without the risk that oral communications such as those alleged here will create a bar to the agency's pursuit of claims." *Id.* at *4.

The same reasoning applies in this case, in that the SEC's informal statements made during the course of investigation cannot serve to preclude an action when the SEC later has sufficient evidence to file a complaint. Moreover, unlike the SEC's statements in *KPMG*, here the SEC did not affirm that AIC's offerings were compliant, but merely commented, during the course of their investigation, that they were not really finding anything.

The AIC defendants also rely upon their filings, and the filings of the relief defendants, as evidence that the SEC knew about the offerings in question and, by failing to take action sooner, showed the agency's approval of them. The Court disagrees. The filings in question, such as the Form D filings for unregistered securities, as well as the audited financial statements, were made by the AIC defendants themselves, and the defendants have not presented any case law supporting their claim that the SEC's acceptance of documents indicating the occurrence of securities sales precludes the SEC

13

from filing an action when it subsequently learns that those sales violated the securities laws. The AIC defendants have similarly not presented evidence that the SEC was made aware of the facts underlying the present allegations and made a conscious decision not to act. Thus, the Court concludes that the materials relied upon by the defendants do not create a genuine issue of material fact as to the availability of the estoppel or waiver defenses.

Although the AIC defendants do not address their unclean hands defense in response to the SEC's motion for summary judgment, in his deposition testimony, Skaltsounis claims that the SEC engaged in numerous acts of misconduct, including accusing AIC of running a Ponzi scheme, jumping to conclusions with regards to its allegations, and bringing the present suit in Tennessee rather than Virginia, where AIC is headquartered [Doc. 96-10 at 17-18]. Although the Court notes that the defendants have not presented any evidence to substantiate these claims, more importantly, even taken as true, defendants have not created a genuine issue of material fact that the SEC's actions leading up to the filing of this complaint were egregious, or resulted in prejudice rising to a constitutional level.[6] Accordingly, the Court finds that there is no genuine issue of material fact as to the availability of the equitable defenses raised by defendants, and summary judgment in favor of the SEC is appropriate.

---

[6] With respect to the AIC defendants' arguments concerning venue, the Court notes that the AIC defendants have previously filed a motion based on improper venue, which was denied in an Order by the magistrate judge in this case [Doc. 30].

## 2. Advice of Counsel

The AIC defendants also assert their good faith reliance on the advice of counsel as an affirmative defense, specifically related to the advice given by Tom Grant and the law firm of Troutman Sanders. The SEC, in support of its motion, presented various deposition testimony of office assistants, board members, Skaltsounis, and others, to show that the defendants cannot point to any specific legal advice that was given in relation to the disputed transactions. In response, the AIC defendants submitted an interrogatory response in which they listed the scope of advice received by Grant and Troutman Sanders and the manner in which Grant and Troutman Sanders advised AIC with respect to various transactions. The AIC defendants also submitted a collection of promissory notes and subscription agreements with issuance dates ranging from 2002 through 2006 bearing footnotes with the letters "TS," which the AIC defendants claim stands for Troutman Sanders [Doc. 98-6].

To establish good faith reliance on the advice of counsel, defendants must prove that they "(1) made a complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice." *SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459, 467 (9th Cir. 1985) (citing *SEC v. Savory Industries, Inc.*, 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981)); *see also United States v. Kindo*, 52 F.3d 1373, 1383-84 (6th Cir. 1995) ("The elements of a reliance on counsel defense are (1) full disclosure of all pertinent facts to counsel, and (2) good faith reliance on counsel's advice."). While good faith reliance on

15

advice of counsel by a criminal defendant may rebut evidence of criminal intent, in the context of a securities action, reliance on counsel "is not a complete defense, but only one factor for consideration." *Markowski v. SEC*, 34 F.3d 99, 105 (2d Cir. 1994). "Good faith reliance on the advice of counsel means more than simply supplying counsel with information." *SEC v. Enters. Solutions, Inc.*, 142 F. Supp.2d 561, 576 (S.D.N.Y. 2001). "'Compliance with federal securities laws cannot be avoided by simply retaining outside counsel to prepare required documents.'" *Id.* (quoting *Savoy*, 665 F.2d at 1315 n.28). The burden is on the defendant to establish each element of a reliance on counsel defense. *SEC v. CMKM Diamonds, Inc.*, No. 2:08-cv-437, 2011 WL 30447476, at *3 (D. Nev. Jul. 25, 2011).

The Court finds that the promissory notes and subscriptions bearing the Troutman Sanders initials do not create a genuine issue of material fact as to the AIC defendants' good faith reliance on the advice of Grant or Troutman Sanders. There is no indication, from reviewing the documents in question, that an actual attorney, be it Grant or another attorney at Troutman Sanders, drafted the particular note, or whether an attorney rendered advice or otherwise approved the underlying transactions. There is no evidence that the AIC defendants specifically requested an attorney's advice prior to entering into a specific transaction or that an attorney stated that a specific transaction was legal. The SEC, in contrast, has presented evidence contesting the claim that attorneys prepared each of the documents in question. Della Tabar, who served as Skaltsounis's executive assistant during the relevant time period, testified that once Grant sent "the initial draft,"

16

prior to the issuance of the securities in question, Tabar would prepare a promissory note or subscription agreement for a particular investor at Skaltsounis's direction, filling in the requisite form which was stored on her computer [Doc. 96-17 at 19-20]. With specific regard to the footnotes, Tabar testified that she would change the footnotes to reflect the date, and then would save the document on her computer with the relevant investor's name in the filename [Doc. 104 at 4-5]. Ultimately, however, whether Troutman Sanders's attorneys prepared each form is immaterial to the issue of whether AIC made a full disclosure of its activities to the law firm's attorneys for the specific reason of verifying their legality, as the drafting of documents does not constitute rendering legal advice on a specific transaction.

Tabar testified that, to her knowledge, neither Grant nor Troutman Sanders were consulted prior to filling out each promissory note or subscription agreement, or before the documents were sent to an investor [Doc. 96-17 at 24]. Tabar, in fact, did not recall any time in which Mr. Skaltsounis sought specific advice from any attorney regarding the preparation of the notes, subscription agreements, and reinvestment letters at issue in this case [*Id.* at 18]. Similarly, Skaltsounis testified that, although Grant provided a draft subscription agreement and draft promissory note in or before 2006, Grant was not consulted before Skaltsounis signed each subscription agreement [Doc. 96-10 at 22], and that he could not recall any conversations pertaining to a specific promissory note [Doc. 96-28 at 10]. Nor have the AIC defendants presented evidence on any advice rendered as to what materials should be given to potential investors, or that AIC was selling securities

to purchasers without verifying their accredited status. Thus, the Court finds that, with respect to the issuance of promissory notes and subscription agreements, the AIC defendants cannot meet their burden of showing that they requested advice after fully disclosing the pertinent facts to counsel and relied upon that advice in good faith.

The Court reaches the same conclusion with regard to the AIC defendants' use of reliance upon counsel as a defense to the SEC's allegations that made AIC material misstatements and omissions in the documents sent to investors. While AIC asserts that it relied upon Grant and Troutman Sanders to ensure that "company materials, confidential corporate information, executive summaries, financial statements, and other information" complied with the securities laws [Doc. 98 at 12], AIC has not presented evidence that it solicited an attorney's advice with respect to the preparation of any of these documents, or that an attorney prepared them. Skaltsounis, in contrast, testified that he prepared drafts of executive summaries, pulling information from various departments of AIC, and subsequently sent the documents to Grant and Troutman Sanders for review [Doc. 96-29 at 50]. Skaltsounis also testified that the documents may have been further revised after any such review, and could not recall any specific recommendations provided by Grant or Troutman Sanders [*Id.*]. This does not indicate that AIC's attorneys were aware of the omissions alleged in the relevant documents, nor does it indicate that an attorney concluded the specific activity was compliant with the securities laws. Similarly, with regard to verbal disclosures which the SEC claims were misleading,

Skaltsounis testified that Grant never provided guidance on verbal disclosure, other than stating what disclosures were required [*Id.* at 4].

The AIC defendants rely upon Grant's status as a member of the board of directors as evidence that he approved the offerings and sales in question, and the documents associated with those sales. While the AIC defendants argue that they relied upon Grant, as "the one Board member who held himself out as an expert in securities matters" [Doc. 98 at 13], the AIC defendants have failed to present evidence as to what advice Grant gave the board, after being asked for specific advice and being fully informed of a given issue. At least one board member, Douglas Mussler, who served during the time period in question, testified that, although he assumed Grant and Skaltsounis had additional conversations, Grant did not render specific legal advice during board meetings [Doc. 96-15 at 6]. Mussler stated that any specific discussion related to required disclosures and the specific sales of securities would not likely occur at a board meeting because that was an "operational function" rather than a function of the board [*Id.* at 4].

In this case, the SEC has cited to deposition testimony from eight former employees and executive officers of AIC and its subsidiaries indicating that none of the eight could testify that Grant or Troutman Sanders gave specific legal advice with regard to the offerings at issue in this case [Doc. 94-1 at 21-22]. Viewing the evidence provided by the AIC defendants in response, and all evidence, in a light most favorable to the AIC defendants, does not create a genuine issue of material fact as to the advice of counsel defense. As "the party who raises an affirmative defense has the burden of proof as to

19

those defenses," *United States v. Baker*, No. 3:08-CV-374, 2009 WL 1407018, at *2 (E.D. Tenn. May 19, 2009), and the AIC defendants have not presented evidence that they can sustain that burden, the Court finds that summary judgment in favor of the SEC as to this defense is appropriate. *See SEC v. George*, 426 F.3d 786, 798 (6th Cir. 2005) (noting that to survive summary judgment in light of SEC's evidence, the "defendants needed to present affirmative evidence, not just affirmative assertions, demonstrating a disputed issue of material fact"). Accordingly, the SEC's motion on this defense will be granted.

**B.      Violation of Section 5 of the Securities Act**

The SEC also seeks summary judgment on its claim that the AIC defendants violated §§ 5(a) and 5(c) of the Securities Act for the unregistered sale of securities from 2006 through 2009. The AIC defendants do not dispute that securities were sold during the relevant time period which were not registered; rather, the AIC defendants argue that every sale of securities was made pursuant to one of the exemptions provided for by the statute.

"The Securities Act and the required filing of registration statements under Section 5 exist to protect investors by requiring they receive sufficient information to make informed investment decisions." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 329 (6th Cir. 2013) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953)). Taken together, §§ 5(a) and 5(c) require that securities be registered with the SEC before they

can be sold or offered for sale. 15 U.S.C. § 77e(a), (c).[7] To establish a prima facie

violation of § 5, the SEC must prove the following: "(1) [that] no registration statement

was in effect for the securities; (2) that the defendant directly or indirectly sold or offered

to sell the securities; and (3) that means of interstate transportation or communication

were used in connection with the offer or sale." *Eur. & Overseas Commodity Traders,*

*S.A. v. Banque Paribas London*, 147 F.3d 118, 124 n.4 (2d Cir 1998), *abrogated on other*

*grounds by Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 28269 (2010). Scienter is

not an element of a § 5 violation because that section imposes strict liability on sellers of

securities. *SEC v. Sierra Brokerage Servs.*, 608 F. Supp. 2d 923, 939 (S.D. Ohio 2009)

(citing *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004)). Once the SEC establishes a

prima facie case, the defendant bears the burden of showing that the challenged securities

---

[7] Section 5(a) states:

Unless a registration statement is in effect as to a security, it shall be unlawful for
any person directly or indirectly—
(1) to make use of any means or instruments of transportation or communication
in interstate commerce or the mails to sell such security through the use or
medium of any prospectus or otherwise; or
(2) to carry or cause to be carried through the mails or in interstate commerce, by
any means or instruments of transportation, any such security for the purpose of
sale or delivery after sale.

15 U.S.C. § 77e(a).

Section 5(c) states in relevant part:

It shall be unlawful for any person, directly or indirectly, to make use of any
means or instruments of transportation or communication in interstate commerce
or of the mails to offer to sell or offer to buy through the use or medium of any
prospectus or otherwise any security, unless a registration statement has been filed
as to such security . . . .

15 U.S.C. § 77e(c).

21

transactions fall within one of the enumerated exemptions from registration. *Id.* (citing *Ralston Purina*, 346 U.S. at 126).

In this case, the SEC contends, and the AIC defendants do not dispute, that the AIC defendants offered and sold securities without registering those securities with the SEC. As to the element of registration, Skaltsounis testified during depositions that there were not any registration statements in effect for the common stock, preferred stock, and promissory notes sold during the relevant time period, so that this first element is met [*See* Doc. 96-1 at 3-4]. Regarding the second element, the SEC submitted evidence of stock certificates and subscription agreements, as well as promissory notes and rollover letters on those notes, to prove that securities were in fact offered and sold by the AIC defendants [*See* Doc. 96-2]. As it is undisputed that the AIC defendants sold securities to investors in multiple states, including but not limited to Virginia, Tennessee, and Colorado, the Court also concludes that the SEC has proven the interstate commerce element. Thus, the SEC has brought forward sufficient evidence to establish a prima facie case that the AIC defendants violated § 5. Where the parties disagree, however, is on the issue of whether there is sufficient evidence so as to create a question of fact as to the availability of one of the statutory exemptions of § 5's strict liability provisions.

### 1. Exempted Securities Under Section 3

The AIC defendants, in their amended answer [Doc. 84], claim that "[o]ne or more classes of securities offered by AIC are exempted securities" pursuant to § 3(a)(3) of the Securities Act, concerning notes and similar instruments with maturity dates of nine

months or less, and Section 3(a)(9), concerning securities exchanged with existing security holders where no commission was paid.[8]  The SEC argues on summary judgment that the AIC defendants cannot meet their burden of showing that the securities sold in the relevant time period were exempt under either provision of § 3.

### a.  Notes with Short Term Maturities

Section 3(a)(3) states, in relevant part, that the following securities are exempt from the provisions of the Securities Act:

> [a]ny note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited[.]

15 U.S.C. § 77c(a)(3).  Despite this language, several circuit courts have held that the "'mere fact that a note has a maturity of less than nine months does not take the case out of the [Securities Acts], unless the note fits the general notion of commercial paper.'"[9] *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1132 (9th Cir. 1991) (quoting *Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795, 800 (2d Cir. 1973)) (alterations in original); *see, e.g,. SEC v. Cont'l Commodities Corp.*, 497 F.2d 516, 524-25 (5th Cir. 1974) ("[I]t is the character of the note, not its maturity date, which determines coverage under both the

---

[8] In its motion for summary judgment the SEC notes that neither of the claimed exemptions under Section 3 were pled in response to the original complaint, and were only raised in the AIC defendants' amended answer [*See* Doc. 94-1 n.25].  The Court finds it appropriate to discuss both exemptions, given that the parties have fully briefed these issues.

[9] Commercial paper has been defined by the Supreme Court in this context as "short-term, high quality instruments issued to fund current operations and sold only to highly sophisticated investors."  *Reves v. Ernst & Young*, 494 U.S. 56, 72 (1990).  The AIC defendants have not alleged that the notes at issue fit this definition.

registration provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934."); *see also Am. Bank & Trust Co. v. Wallace*, 702 F.2d 93, 94-95 (6th Cir. 1983) (noting that the "duration . . . of the promissory note does not per se remove it from the purview of either the 1934 [Exchange] Act or 1933 [Securities] Act").

Rather than focus on the maturity of the notes in question, courts have focused on the methodology adopted by the *Reves* Court in determining whether a note falls within the scope of the Securities Act's provisions, beginning with the presumption that every note is a security. *Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990); *see, e.g., SEC v. Tee to Green Golf Parks, Inc.*, No. 00-CV-4788, 2011 WL 147862, at *6-7 (W.D.N.Y. Jan. 18, 2011). The presumption may be overcome by showing that the note in question bears a "family resemblance" to those notes which have been judicially recognized as not qualifying as securities,[10] based upon the analysis of four factors: (1) the motivation prompting the transaction; (2) the plan of distribution; (3) the reasonable expectation of the investing public; and (4) whether some factor reduces the risk of the instrument, rendering the federal securities laws unnecessary. *Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 585 (6th Cir. 2000) (quotations and citations omitted). Under the first

---

[10] The *Reves* Court provided the following list of notes which it held were not securities:

> notes delivered in consumer financing, notes secured by a mortgage on a home, notes secured by a lien on a small business or some of its assets, notes relating to a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivables, notes which formalize an open-account indebtedness incurred in the ordinary course of business, and notes given in connection with loans by a commercial bank to a business for current operations.

*Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 585 (6th Cir. 2000) (citing *Reves*, 494 U.S. at 65).

24

factor, "if the seller's motivation is 'to raise money for the general use of a business enterprise . . . and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a security.'" *Id.* (quoting *Reves*, 494 U.S. at 66). As noted by the Sixth Circuit in *Bass*, the fourth factor not only includes comprehensive regulatory schemes but also the presence of collateral or insurance as evidence of reduced risk. *Id.*

Applying the foregoing to the promissory notes offered and issued by the AIC defendants, the Court concludes that the promissory notes, regardless of their maturities, represent securities subject to the provisions of § 5. Initially, the Court notes that the AIC defendants do not dispute that none of the judicially created exceptions set forth in *Revis* apply in this case [*See* Doc. 96-1 at 9-23]. Turning to the first *Revis* factor, it appears that AIC's purpose in selling the notes was to raise money for "the general use of AIC and its subsidiaries" [*Id.* at 24], and from AIC's perspective, those who received notes from AIC did so because of the prospect of interest [*Id.* at 27].[11] *See Reves*, 494 U.S. at 68 (noting that investors hoped to earn profit in the form of interest in finding note to be security). As to the second factor, Skaltsounis testified that both current customers of CB Securities and new customers received promissory notes, and that approximately 40 notes were sold to customers in several states, so that the plan of distribution also indicates the notes were securities. *Cf. Tee to Green*, 2011 WL 147862 at *7 (noting that sale of promissory notes in at least six different states indicated that the notes in question were securities). The

_____

[11] That purchasers of the notes did so for reasons of profit is further evidenced by the notes themselves, at least some of which offered an interest rate of 12.5% [*See* Doc. 96-34 at 4].

25

AIC defendants have not argued or presented evidence that the expectation of the note holders was anything other than to receive a return on their investment in the form of interest over the maturity period of their respective notes, under the third factor. Finally, the AIC defendants have not shown that there was any independent regulatory scheme to protect note holders, nor does it appear that there was any collateral or insurance involved related to the promissory notes. Accordingly, the Court concludes that the notes in question were "securities" for purposes of the Securities Act and thus are not exempt from the requirements of § 5 under § 3(a)(3).

### b. Securities Sold to Existing Security Holders

The AIC defendants also claim that at least some of the securities sold were exempt under § 3(a)(9), which exempts "any security exchanged by the issuer with its existing securities holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange." 15 U.S.C. § 77c(a)(9). In response to the SEC's motion for summary judgment, however, the AIC defendants have not submitted evidence of transactions involving existing exclusively AIC securities investors, nor submitted any evidence or affidavits on whether those who sold AIC securities received a commission.[12] The SEC, in support of its motion, submitted the interrogatory responses of AIC and Skaltsounis noting the investors with whom Skaltsounis communicated during the relevant time period, many of whom appear to be

---

[12] In fact, the AIC defendants, in response to the SEC's motion for summary judgment, only state that there is "no evidence that there was a commission or remuneration paid" in regard to a transaction for the rollover of a promissory note [Doc. 98 at 16].

26

first-time investors referred by CB Securities brokers or members of the AIC board to invest in the company [Doc. 96-25 at 14-17]. In light of this evidence, and given that the AIC defendants have not presented any evidence indicating that the sole recipients of securities in this time period were current investors, which is their ultimate burden to prove in asserting a statutory exemption, the Court finds that the AIC defendants have not created a genuine issue of material fact as to whether the securities in question were exempt pursuant to §3(a)(9).

## 2. Exempt Transactions Under Regulation D

The AIC defendants also contend that the securities offerings and sales occurring between 2006 and 2009 did not involve public offerings so that the transactions themselves are exempt under § 4 of the Securities Act and the regulations promulgated thereunder, commonly referred to as the "Regulation D exemption," 17 C.F.R. § 230.501 *et seq.* The AIC defendants specifically rely upon Rule 506 under Regulation D, based upon the nature of the offering and the status of their investors.

Under § 4(a)(2), the registration requirements of the Securities Act do not apply to "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2). A non-public offering has been defined by the Supreme Court as "'[a]n offering to those who are shown to be able to fend for themselves.'" *Mark v. FSC Securities Corp.*, 870 F.2d 331, 333 (6th Cir. 1989) (alteration in original) (quoting *Ralston Purina*, 346 U.S. at 125. Regulation D, and Rule 506 in particular, codify this principle, and set forth specific

conditions that must be met in order to fall within the safe harbor. 17 C.F.R. § 230.506.[13]

Under Rule 506 the offers and sales must first satisfy all of the terms and conditions set

forth in Rules 501 and 502, as well as meet the following specific conditions:

> (i)    Limitation on number of purchasers. There are no more than or the
> issuer reasonably believes that there are no more than 35 purchasers of
> securities from the issuer in any offering under this section.
> . . . .
>
> (ii)    Nature of purchasers.  Each purchaser who is not an accredited
> investor either alone or with his purchaser representative(s) has such
> knowledge and experience in financial and business matters that he is
> capable of evaluating the merits and risks of the prospective investment, or
> the issuer reasonable believes immediately prior to making any sale that
> such purchaser comes within this description.

*Id.*

Rule 501 notes that in calculating the total number of purchasers, relatives of other

purchasers with the same primary residence are excluded, as are "accredited investors."

An accredited investor is defined as any person who comes within one of eight

enumerated categories, "or who the issuer reasonably believes" comes within one of the

categories, which include the following: banks; business development companies; non-

profit organizations with a certain amount of assets; directors, executive officers, and

general partners of the issuer (or of a general partner of the issuer); natural persons with

individual or joint net worth exceeding $1 million; and any natural person with individual

income of $200,000 (or joint income of $300,000) in each of the two most recent years

and has a reasonable expectation of reaching the same income level in the current year.

---

[13] In *Mark*, the Sixth Circuit noted that it was the company seeking the application of the
safe harbor's burden to prove that the conditions of Rule 506 have been met.  870 F.2d at 334.

28

17 C.F.R. § 230.501(a). "In order to come within the Rule 506 safe harbor, [the issuer] is required to offer evidence of the issuer's reasonable belief as to the nature of *each* purchaser." *Mark*, 870 F.2d at 335; *see also SEC v. Credit First Fund, LP*, No. CV05-8741 DSF, 2006 WL 4729240, at *12 (C.D. Cal. Feb. 13, 2006) ("The party claiming the exemption must show that it is met not only with respect to each purchaser, but also with respect to each offeree.") (quoting *SEC v. Murphy*, 626 F.2d 633, 644-45 (9th Cir. 1980)).

Rule 502 sets forth conditions for the type of financial and other information that must be provided to any non-accredited investors for offers and sales under Regulation D, and requires that such information be provided within a reasonable period of time prior to sale. Rule 502 also sets forth limitations on the manner of the offering and types of solicitations that are permitted, as well as limits on resale of any securities sold under Regulation D.

In this case, the SEC argues that the safe harbor afforded by Rule 506 is unavailable to the AIC defendants because securities were sold to individuals who did not qualify as unaccredited investors or were otherwise sophisticated so as to understand the merits and risks of the prospective investment and who did not receive the requisite financial information. Although the SEC claims that numerous investors of AIC stock and notes during the relevant time period were not accredited, the SEC submitted evidence on several such investors, which the AIC defendants addressed in their response and which the Court will analyze to determine the availability of Rule 506.

29

The first investor that the SEC argues is unaccredited is Jovena Daniels, who filled out a "Direct Account Form" with CB Securities on September 12, 2009, and who was procured by defendant Graves [Doc. 96-33]. Ms. Daniels, a resident of Stafford, Virginia, indicated that her income was between $0 and $29,000, and noted that she was unemployed at the time. Although she estimated her financial net worth as being between $100,000 and $149,000, she wrote that her total net worth was "$300,000" [*Id.*]. Ms. Daniels signed the form indicating that she was aware of the nature of what was being offered (*i.e.* investment products by a non-bank) and that she had received a copy of the customer agreement (which is not included with the account form itself in the record). In the notes for use by CB Securities, its representative took Ms. Daniels's driver's license information. The form also indicates that a CB Securities principal reviewed the form on September 16, 2009 [*Id.*]. It does not indicate whether Ms. Daniels was deemed an accredited investor, whether Ms. Daniels herself was required to attest to her status as an accredited investor, or whether Ms. Daniels was informed that the promissory note was being issued without registration. A promissory note in the amount of $50,000, along with $2,500 in interest, was issued by AIC on September 28, 2009 [Doc. 98-8]. The Court notes that the promissory note itself similarly does not indicate that Ms. Daniels has been qualified as an accredited investor, or that the note's validity is dependent upon her status as such, or that the note was issued without registration.

From this, none of the documents in the record indicate that Ms. Daniels was an accredited investor, nor explain how AIC's agents formed a "reasonable belief" as to Ms.

Daniels's status prior to issuing the note, particularly given that Ms. Daniels was a new customer of CB Securities. At his deposition, Skaltsounis testified that he had not seen the form before and could not authenticate it. As AIC has not presented any evidence that Ms. Daniels was an accredited investor, and the SEC has presented evidence that she was not, the Court finds that Ms. Daniels was not an accredited investor, so that the AIC defendants were required to meet the conditions set forth in Rules 502 and 506. As to Rule 502's requirements, the AIC defendants have not presented evidence that Ms. Daniels received any financial information, which the defendants had an obligation to provide, or that Ms. Daniels was advised on the limitations of resale of the note. In addition, the AIC defendants have not presented evidence which led them to reasonably believe that Ms. Daniels, assuming she received the requisite information, had "such knowledge and experience in financial and business matters" so that she was capable of evaluating the merits and risks of the prospective investment. 17 C.F.R. § 230.506(b)(2)(ii). Thus, the Court concludes that the safe harbor provisions of Rule 506 were not available to the AIC defendants in their offering and sale of the promissory note to Ms. Daniels.[14]

---

[14] The AIC defendants argue that regardless of her status as an accredited investor, the note issued to Ms. Daniels is exempt because it has a maturity of six months. The maturity of the note, however, is immaterial to the issue of whether the safe harbor provisions of Rule 506 were available to the AIC defendants, and as discussed, under the *Reves* analysis all of the notes in question were subject to the Securities Act's requirements.

31

The Court reaches a similar conclusion with respect to several promissory notes issued to Clarice Newman, a resident of Maryville, Tennessee.[15]  Ms. Newman filled out several account forms on March 3, 2008 with CB Securities, procured by CB Securities representative Carol LaRue [Doc. 96-33 at 12-14].  Ms. Newman indicated that she had 35 years of investment experience, was retired, with an income between $30,000 and $59,000, and a net worth of $350,000 [*Id.*].  Similarly to Ms. Daniels, there is no other information on the form indicating and AIC has otherwise presented evidence that Ms. Daniels was an accredited investor.  Although the form indicates that Ms. Newman was an existing customer of CB Securities, this alone cannot create a genuine issue of material fact as to accredited status, particularly in light of AIC's admission that Ms. Newman was potentially unaccredited and that it did not know what documents were given to her prior to her investment [Doc. 98 at 20].  Without any evidence that the AIC defendants had a reasonable belief as to either Ms. Newman's status as an accredited investor or to their compliance with the conditions of Rules 502 and 506, the Court finds that the sale of promissory notes to Ms. Newman were not covered under Regulation D.[16]

---

[15] Although there is no promissory note issued to Ms. Newman in the record, the AIC defendants admit in their response to the SEC's motion for partial summary judgment that Ms. Newman received two promissory notes in 2008 and rolled her investment into a new promissory note in July 2009 [Doc. 98 at 20 n.11].

[16] The Court notes that the SEC submitted additional account forms for individuals for whom there do not appear to be promissory notes or subscription agreements in the record.  Two of these individuals, Elizabeth Green (income of less than $59,000, net worth of less than $800,000) and Robert Stuart (income of less than $130,000, net worth of "$500,000+") on the face of the forms, do not appear to meet any of the definitions of "accredited investor status," nor have the AIC defendants presented any other evidence as to these investors' status or receipt of the requisite financial information [Doc. 96-33].

32

In response, the AIC defendants first reference an answer to one of the SEC's interrogatories, in which AIC stated that it relied upon four categories of information in justifying that it had a reasonable belief as to the status and nature of each investor: 1) the advice of Troutman Sanders and Tom Grant; 2) due diligence by AIC and its authorized agents; 3) "existing and established familial, personal and business relationships, including information supplied by Investors on account opening forms, in client agreements, and relating to other private placements" [Doc. 98 at 19]; and 4) investor representations in promissory notes, subscription agreements, and other documents relating to investments.

As to the first category, AIC notes that it was informed by its attorneys that the Form D's, offering materials, and instruments used in connection with the AIC investments were compliant. As previously discussed, the AIC defendants have not presented any evidence that its counsel examined any of the actual investors who received these unregistered securities to determine whether they were accredited, or that its attorneys were aware of any such specific transactions. Although the AIC defendants submitted a compilation of every Form D filed on their behalf as an exhibit to their response [Doc. 98-7], as required under Regulation D, the form itself does not inform the SEC (or the attorney preparing the form) anything about the nature of the investor. The forms discuss the transactions, rather than the investors themselves and the information provided to them, the focal point of Rule 506.

The AIC defendants have similarly not directed the Court to any evidence describing the process by which AIC's agents/brokers exercised due diligence prior to selling securities to investors, nor have they presented any financial information that was given to investors prior to their investment. During deposition testimony, Skaltsounis stated that he did not know what information was provided to potential preferred stockholders or potential promissory noteholders [Doc. 96-1 at 37]. Although the AIC defendants submitted, and the record contains, several subscription agreements and questionnaires completed by investors where they are specifically asked to attest to their accredited status [Doc. 98-9 (subscription agreement and questionnaire for George and Patricia Gilbert)], the AIC defendants have not presented similar agreements and questionnaires for the other new customers whose investments were solicited during the relevant time period. *See Mark*, 870 F.2d at 337 (noting that blank subscription documents and questionnaires did not amount to probative evidence of compliance with Rule 506 when it was the "answers and information received *from* purchasers" that was determinative). Moreover, while the account forms contain blank spaces related to accredited status as discussed, *supra*, there is no indication that the account forms or promissory notes given to noteholders contain any places where potential investors were to affirm their accredited status, unlike the subscription agreements. This makes the AIC defendants' reliance upon the investors' agreement to invest in a promissory note as a basis for compliance with Rule 506 unreasonable, particularly when several account forms, on their face, indicate unaccredited status. Because the Court finds that the AIC

34

defendants have not presented any evidence creating a genuine issue of material fact as to their having met the conditions of Rule 506 for each investor, and the SEC has presented affirmative evidence showing the unavailability of the safe harbor, the Court concludes that the sales of AIC securities were not exempt under Regulation D.

### 3.     Exemption Under Section 4(a)(1)

In their response to the SEC's motion for summary judgment, the AIC defendants claim that the provisions of § 5 do not apply as "[t]here is no genuine dispute that CBS and Skaltsounis are not issuers, underwriters or dealers in AIC securities" [Doc. 98 at 16]. The SEC argues that the defense is baseless given the fact that both CB Securities and Skaltsounis are dealers, and that, even if they were not dealers, their participation in the transaction is enough to impose liability under §§ 5(a) and 5(c).

Section 4(a)(1) of the Securities Act states that the provisions of § 5 do not apply to "transactions by any person other than an issue, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). The Securities Act defines an underwriter, in part, as any person who "offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking . . . ." 15 U.S.C. § 77b(11). Similarly, a "dealer" is defined as "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." 15 U.S.C. § 77b(12).

The Courts finds defendants' asserted defense to be meritless based upon the language of the statute. Skaltsounis testified during his deposition that he procured many of the AIC investments directly, was responsible for signing off on numerous subscription agreements and promissory notes, and met with numerous investors regarding the sale of AIC securities [Doc. 96-25 at 14-16]. CB Securities, a registered broker-dealer with the NASD and FINRA during the relevant time period, and its registered representatives, including Skaltsounis, Guyette and Graves, all engaged in the sale of AIC stock and notes during the relevant time period. The defendants have presented no evidence to contradict the record, which shows that the AIC defendants directly participated in the distribution of AIC's securities, so that the transactions are not exempt under § 4(a)(1).

For the reasons previously discussed, the Court finds that the AIC defendants' claimed exemptions and defenses to § 5 liability are not well-taken, and there is no genuine issue of material fact as to whether the AIC defendants violated §§ 5(a) and 5(c) through the unregistered sale of securities.[17] Accordingly, the SEC's motion for summary judgment will be granted and judgment will be entered against the AIC defendants and in favor of the SEC as to this claim.

---

[17] The Court notes that the AIC defendants re-assert their advice of counsel defense to this claim, but, as *scienter* is not an element of a § 5 violation, *Sierra Brokerage*, 608 F. Supp. 2d at 939, the Court need not consider this defense as it relates to this specific claim.

36

## C.    Liability of Relief Defendants

The SEC also seeks what it terms "contingent summary judgment" as to its claims of disgorgement against the relief defendants, who received funds from AIC that represented the proceeds of its alleged fraudulent and prohibited transactions at issue. Specifically, the SEC claims that there is no genuine issue of material fact as to the relief defendants' receipt of funds, and to there being no legitimate claim to those funds, so that the relief defendants are liable so long as the SEC proves the underlying violations against the AIC defendants.  The relief defendants argue that the relief defendants have a legitimate claim to the funds at issue because they performed legitimate services, namely, enhancing shareholder value by growing revenues, which, given their position as subsidiaries of AIC, provided value to AIC's shareholders [Doc. 98 at 22].

"'Federal courts may order equitable relief against [such] a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.'" *SEC v. George*, 426 F.3d 786, 798 (6th Cir. 2005) (quoting *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)).  Courts have noted that the receipt of property as a gift, without the payment of consideration, is insufficient to create a "legitimate claim" immunizing property from disgorgement.  *CFTC v. Walsh*, 618 F.3d 218, 226 (2d Cir. 2010) (citing cases).  Although not addressed by the Sixth Circuit, other courts have held that "relief defendants who have provided some form of valuable consideration in good faith in return for proceeds of fraud are beyond the reach of the district court's disgorgement

37

remedy." *Id.* (citing *Janvey v. Adams*, 588 F.3d 831, 834-35 (5th Cir. 2009) (purchaser of certificates of deposit from bank had "ownership interest")); *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191-92 (4th Cir. 2002)); *see also FTC v. Bronson Parnters, LLC*, 674 F. Supp. 2d 373, 392 (D. Conn. 2009) ("A relief defendant can show a legitimate claim to the funds received by showing that some services were performed in consideration for the monies.").

The parties do not dispute that AIC gave capital contributions to each of the relief defendants. The SEC provided the report of an expert witness, Professor Ray Stephens, who determined the following amounts of capital contributions made to the relief defendants during the relevant time period: (1) AIC to Waterford, $541,000; (2) AIC to Advent, $516,150; and (3) AIC to CBS Advisors, $58,686.75 [Doc. 96-8 at 15]. The defendants do not dispute these amounts in their response. Thus, the Court concludes that these are the amounts that the relief defendants received from AIC.

The relief defendants dispute whether they have a legitimate claim to the distributed funds. Specifically, the relief defendants argue that they provided services back to AIC after receipt of the funds by growing their business, increasing their revenue, and thus increasing shareholder value to AIC. The relief defendants point to audited financial statements as proof of the value they provided to AIC. Professor Stephens, however, stated in his report that "AIC's ownership of each of its subsidiaries did not change due to the cash capital contributions made to CB Securities, Waterford, Advent, or CBS Advisors. AIC received nothing of value in exchange for the cash capital

38

contributions to CB Securities, Waterford, Advent, and CBS Advisors" [Doc. 96-8 at 11]. The SEC also submitted deposition testimony indicating that neither Advent [Doc. 96-35 at 5], Waterford [Doc. 96-37 at 3], nor CBS Advisors [Doc. 96-39 at 5] provided specific services that were tied to the capital contributions.

The Court concludes that the relief defendants do not have a legitimate claim to the contributions made by AIC. The relief defendants argue that the growth of their business was "consideration" for the contributions received by AIC; however, the contributions were a result of AIC's existing ownership interest in the relief defendants, which did not change in this time period [*See* Doc. 96-8 at 11-12]. Similarly, the benefit AIC received from the relief defendants' growth of their businesses was a direct result of AIC's ownership interest, rather than as consideration for the funds received. As the relief defendants were subsidiaries of AIC, the Court finds it would be inappropriate to allow those who violate the securities laws to retain the benefit of their fraudulent acts by transferring the funds to a subsidiary or subsidiaries, which in turn generate revenue for the parent through legitimate means. Moreover, unlike relief defendants who purchased ill-gotten proceeds for value or who earned such proceeds as a result of their employment relationship, the relief defendants have not presented any evidence that the contributions received here involved the exchange of benefits and detriments which serves as consideration to create an independent ownership interest in the received funds. Accordingly, the Court finds that the contributions made by AIC were gratuitous and are

subject to disgorgement.[18]  The SEC's motion in this regard is granted to the extent that the relief defendants will be subject to disgorgement pending a finding of liability against the AIC defendants on the SEC's claims.

## IV.     Conclusion

For the reasons previously stated, the Court finds that the SEC has shown there is no genuine issue of material fact as to the claims and defenses presented in their Motion for Partial Summary Judgment [Doc. 93], and the defendants have not presented any evidence to rebut this showing.   Accordingly, the SEC's Motion for Partial Summary Judgment [Doc. 93] is hereby **GRANTED** to the extent discussed herein.   It is **ORDERED** that the SEC submit an appropriate form of judgment.   This matter will proceed to trial on the SEC's remaining claims.

IT IS SO ORDERED.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

---

[18]  Although the relief defendants assert the same affirmative defenses as the AIC defendants to preclude the availability of disgorgement, the Court finds that these defenses fail for the same reasons as previously discussed by the Court.